UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

Case No.

| | |
|---|---|
| AHAJI AMOS and<br>KIRK AMOS DELIVERY<br>AND COURIER, LLC,<br><br>      Plaintiffs,<br><br>  vs.<br><br>AMAZON LOGISTICS, INC.,<br><br>       Defendant. | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Ahaji Amos and Kirk Amos Delivery and Courier, LLC, complaining of Defendant Amazon Logistics, Inc., alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Ahaji Amos ("Amos") is a citizen and resident of Durham County, North Carolina.

2. Plaintiff Kirk Amos Delivery and Courier, LLC ("Kirk Amos LLC") is a North Carolina limited liability company with its principal office in Durham County, North Carolina. Ahaji Amos is its sole member.

3. At all relevant times, Amos and Kirk Amos LLC were transportation workers engaged in the movement of interstate commerce and therefore exempt from the Federal Arbitration Act's application. *See Rittmann v. Amazon.com, Inc.,* 971 F.3d 904, 907 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1374, 209 L. Ed. 2d 121 (2021).

4.    Defendant Amazon Logistics, Inc. ("ALI" or "Amazon") is a Delaware corporation with its principal office in Seattle, Washington.   ALI does business in North Carolina pursuant to a certificate of authority issued by the North Carolina Secretary of State and has a registered office in North Carolina.

5.    At all relevant times, ALI maintained a place of business at its DRT1 logistics station in Durham, North Carolina.

6.    This Court has personal jurisdiction over ALI pursuant to N.C.G.S. § 1-75.4.

7.    This Court has diversity subject matter jurisdiction over this case under 28 U.S.C § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

8.    This Court has federal question subject matter jurisdiction over this case under 28 U.S.C. § 1331 because Plaintiff's cause of action for violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, arises under the laws of the United States.

9.    This Court has supplemental jurisdiction over Plaintiff's state law causes of action under 28 U.S.C. § 1367 because they are so related Plaintiff's federal claim that they form part of the same case or controversy under Article III.

## GENERAL BACKGROUND

10.   E-commerce giant Amazon.com, Inc. and its subsidiaries including ALI ("Amazon.com" or "Amazon") comprise the world's largest retailer.   In 2019 Amazon caused over 2.5 billion packages to be delivered throughout the United States, including in North Carolina. It is estimated that by 2022, Amazon's package delivery volume could

reach 6.5 billion packages per year in the United States. Amazon is one of the largest businesses engaged in the interstate shipment of goods in the United States.

11.     ALI is a transportation and logistics company that, on information and belief, primarily serves Amazon.com, Inc. by delivering packages to Amazon.com's Prime customers. Amazon.com Prime customers shop online at Amazon.com's online portal and order goods from Amazon for home delivery.

12.     Amazon.com, Inc. contracts with ALI, a wholly owned subsidiary of Amazon.com, Inc., for the last mile delivery of products Amazon.com sells online to its Prime customers. ALI, in turn, contracts with persons employed through the Delivery Service Partner ("DSP") program to hire and manage delivery drivers and run its delivery operations.

13.     The DSP Program was carefully designed to allow Amazon and ALI to shift costs and liabilities onto DSPs, while maintaining complete control over the DSPs' day-to-day operations, drivers, and potential for success. On information and belief, Amazon designed and implemented the DSP program for the primary purpose of improperly evading employment laws, labor and wage laws, transportation and logistics laws and regulations, motor vehicle negligence liability exposure, and other legal responsibility for a vast army of delivery drivers and massive van fleet. Namely, Amazon sought to interpose a layer of supposedly "independent" business entities, DSPs, between itself and its drivers to act as a legal firewall between Amazon and its employees. In reality, the DSPs themselves served as Amazon's managerial employees that hired and managed its drivers and ran its delivery operations. Through this sleight-of-hand, Amazon sought to disguise and deny its employment of tens of thousands of delivery drivers while shifting all operational liability

3

onto hundreds of DSPs while ensuring that Amazon, and not DSPs, would capture all the value created by the DSPs and its other employees' hard work and labor.

14.     Amazon advertised and solicited its DSP program to individuals throughout the United States and in North Carolina, including Amos.  Amazon represented that DSPs could earn from $75,000 to $300,000 annually.  DSP program candidates needed only minimal financial resources to participate: $10,000 in startup costs and $30,000 in total liquid assets.  DSP program candidates also needed no prior logistics experience.

15.     Amazon expressly solicited only lone individuals, not companies, partnerships, or groups, to become DSPs.  Amazon expressly stated that it only accepted DSP program applications from individuals, and that it rejected all applications from companies or those submitted by more than one person.

16.     The process to be selected as a DSP was akin to a traditional job interview.  During the interview process, only the individual applicant was interviewed and only the applicant's own experience and qualifications were considered.  Amazon requested information from candidates about their previous work experience, leadership, financial health, community involvement, and geographic preferences, as well as a credit check, background screening, and motor vehicle record check. If selected to progress for further consideration, next steps included a screening interview, an opportunity to ask questions of a current Amazon DSP via a live webinar, and then a final round of virtual interviews. Only once Amazon provided a candidate with an offer to become a DSP could the candidate learn specific details about the station, routes, and financials before making a final decision whether to accept the offer.

4

17.     Amazon and ALI required all DSP selectees to incorporate or form their own business entity prior to signing the DSP Program Agreement and becoming a DSP. Amazon required the business entity to be an S-Corporation, a C-Corporation, or a Limited Liability Company.  No other entity types or unincorporated associations such as a general partnership or sole proprietorship were permitted.

18.     All persons employed or selected to be employed as DSPs had to comply with Amazon's Operations Manual for the DSP program.  The Operations Manual provided them a step-by-step walkthrough as to how to incorporate or form the required business entity.  The walkthrough contained detailed instructions on choosing the entity type from the three allowed choices, selecting a company name, registering for an Employee Identification Number (EIN), designating a registered agent, and other necessary basic steps for entity incorporation or formation.  Amazon required that all entity names meet its approval.

19.     In the Operations Manual, Amazon offered to-be DSPs a package deal with LegalZoom that included everything needed for the person to complete the steps necessary for business entity incorporation or formation.  LegalZoom offered consumers online access to interactive software that generated legal documents based on the consumer's answers to questions presented by the software.  Using the software, individuals could incorporate or form a business entity with minimal effort and no legal expertise.

20.     On information and belief, Amazon received a financial benefit from LegalZoom whenever potential DSPs used its recommended services.

21.     ALI expressly required that each person seeking to be employed as a DSP interpose the newly-formed business entity as the nominal party entering the DSP Program Agreement and serving as the DSP.  Amazon's business development manager had to verify the DSP selectee's business entity before providing the instructions to sign the DSP Program Agreement through the DSP Portal.  This process ensured that candidates could only sign the Program Agreement under the guise of their required business entity rather than individually.

22.     On information and belief, Amazon had several reasons for allowing only individuals to apply for and be accepted into the DSP program while allowing only the individual's newly-formed business entity to execute the DSP Program Agreement.  One reason was that Amazon intended that the mandatory interposition of a business entity would help mask the true nature of Amazon's relationship with the DSP – that of employment.  Another reason is that it ensured that DSPs would not be well-capitalized, established companies with bargaining leverage rather than dependent individuals needing only minimal financial resources.

23.     Amazon instituted further restrictions intended to keep DSPs dependent and having minimal leverage.  These included that no person with an interest (equity, financial, debt, contract, or other) in a DSP business could have an interest in any other DSP business.  Similarly, a DSP could not have a spouse or partner with an existing DSP business.  In addition, a DSP was only allowed to operate within a single delivery station and could not expand beyond that into other stations in the same city or into other cities.

6

24.     In 2019, Amos learned of the DSP program through Amazon's national advertising campaign and successfully applied to become a DSP.

25.     Before she entered the DSP Program Agreement ("Agreement"), Amos formed a limited liability company as required by Amazon.  The limited liability company, Kirk Amos Delivery and Courier LLC, was a formed as a single-member North Carolina limited liability company with Amos as its sole member and manager.  Amos named the company "Kirk Amos" because that was her middle and last name.

26.     As required by Amazon, Amos paid Amazon a $10,000 fee to enter the DSP program.

27.     Amazon represented that the Program Agreement was the primary legal document that governed the DSP's business relationship with Amazon.  As required by Amazon, on May 7, 2019, Amos signed the Program Agreement as a representative of Kirk Amos, LLC, the nominal party to the Agreement.   Upon signing, Amos, through Kirk Amos LLC, became a DSP.

28.     Under the DSP program, Amazon required Amos, through Kirk Amos LLC, to hire drivers to deliver packages provided by Amazon on delivery routes selected by Amazon to Amazon's customers.

29.     Amos, through Kirk Amos LLC, provided services out of Amazon's DRT1 station in Durham, North Carolina, delivering Amazon Prime packages from August 6, 2019 until April of 2021, when Amazon terminated the relationship.

30.    The Program Agreement stated that ALI "may establish" additional terms, conditions, policies, guidelines, standards, and rules.   The Program Agreement incorporated these additional rules, called Program Policies, by reference.

31.    In reality, rather than a set of guidelines or standards having minimal bearing, the Program Policies controlled all material aspects of the relationship between Amazon and Amos and other DSPs, including payment rates.   The Program Policies governed all material terms of the transportation, delivery, and other services performed by Amos as a DSP and set forth the requirements, parameters, and guidance for DSPs' daily operations.

32.    Amazon solely controlled and determined the terms of the Program Policies. Worse, Amazon had unfettered discretion to change the Program Policies to its unfair advantage whenever it wanted and without DSP consent or approval, and it did so frequently and without advance notice.   Amazon even applied changes retroactively to DSPs.

33.    The Program Policies increased DSP performance standards to the point that they could not be achieved while retaining profitability.   Essentially, Amazon continually rewrote the rules of the game to ensure that it always won and DSPs lost.

34.    Amazon's complete control to make and change all material terms to the DSP program, many of which were not written, disclosed, or consented to by DSPs, including Amos, through Kirk Amos LLC, and enforce them at its whim allowed Amazon to constrain and prevent any genuine opportunities for DSPs to succeed as actual, independent businesses.

8

35.     The Program Policies were updated weekly by Amazon via email, and later solely

through a communications portal where more than about 30 notifications were posted daily.

36.     Under the Program Policies, a rate card set forth the reimbursement rates for DSPs,

including Amos, through Kirk Amos LLC.  Amazon updated the rate card at least twice

while Amos was a DSP, unilaterally reducing her reimbursements.

37.     Other than being told of the potential to earn up to $300,000, Amos was not

informed of the payment terms of the DSP program, including the payment and bonus

structure, until after operations began.  Amazon controlled these payment terms as part of

its Program Policies.

38.     Amazon did not disclose to Amos or other DSPs that meeting the Program Policies

required the payment of fees that exceeded the per delivered package fees. Specifically the

following fees were required, but not reimbursed, by Amazon: drivers' health insurance,

Amazon-branded van insurance, dispatcher salaries, manager salaries, driver overtime pay,

human resource manager/recruiter, clock in and clock out clerk, payroll processing, driver

pay in excess of ten hours per day, and pay for drivers that showed up for work when

Amazon canceled a route during pre-route hours.

39.     Amazon did not disclose to Amos that reimbursement by Amazon would decrease

without notice.

40.     Program Policy updates negatively affected daily reimbursement for monthly

expenses, like vehicle leasing and parking, and a reduction in per piece compensation.

41.     One Program Policy update required vehicle repairs to be completed within 14 days, which was not possible due to the unavailability of service providers capable of servicing the delivery vans required by Amazon. In actuality, repairs generally took 6-8 weeks.

42.     Amazon's Program Policy updates resulted in nearly all DSP services being performed by the DSPs, including Amos, through Kirk Amos LLC, under the DSP program for free.

43.     Amazon's changes to the Program Policy resulted in lower DSP reimbursements and increased profits for Amazon.

44.     The DSP program was so one-sidedly in favor of Amazon that no DSP, including Amos, through Kirk Amos LLC, could influence Amazon station operations or any other aspects of the program.

45.     Amos, through Kirk Amos LLC, and the drivers she hired and managed did not deliver packages for anyone other than Amazon.

46.     Amazon required each DSP, including Amos, through Kirk Amos LLC, to use its branded vehicles, uniforms, service manuals and service standards as outlined in the Program Policies.

47.     Amos' drivers exclusively wore Amazon-branded uniforms, which were inspected by Amazon daily.   Amazon-branded uniforms included at least one Amazon-owned trademark.

48.     Amazon required Amos' drivers to complete training provided by Amazon.

49.     Under the DSP program, Amazon closely monitored and controlled all material aspects of Amos' work and the work of her co-employees.

Case 1:22-cv-00055   Document 1   Filed 01/24/22   Page 10 of 54

50.    The nature of the work performed by drivers was similar and standardized at each Amazon delivery station and was centrally controlled and directed by Amazon.

51.    Amazon directed Amos' drivers' day-to-day activities through direct contact with them.

52.    Amazon set the delivery routes and then assigned and provided them to its DSPs, including Amos, through Kirk Amos LLC. Every week, Amazon sent Amos, through Kirk Amos LLC, the number, type, and start time for the delivery routes for the upcoming week. Amos then assigned the drivers to complete those routes.

53.    Amos' drivers were each assigned a cell phone loaded with proprietary Amazon delivery software, ("Amazon Flex") and drove an Amazon-branded vehicle to the Amazon delivery station, where Amazon employees pre-sorted packages for delivery. Drivers then logged into Amazon Flex to access their Amazon assigned route and picked up the assigned packages. The packages were not transformed or modified during the shipping process but were delivered in the same condition as they were shipped to the Amazon delivery station.

54.    Amazon, through its Cortex system, tracked and monitored Amos' drivers' job performance in real time, tracking delivery rate, delivery speed, delivery accuracy, driver distractions, seatbelt use, driving speed and acceleration, and adherence to a delivery schedule created by Amazon through Amazon Flex and its EMentor application. Every day, Amazon sent an email documenting each delivery driver's job performance to DSPs, including Amos, through Kirk Amos LLC.

55.    Amazon unilaterally evaluated and ranked drivers based on oft-changing criteria including delivery completion rate, safe driving scores, seatbelt off rates, speeding event

11

rate, distractions rate, picture quality, door scan rate, and attended delivery rate. Drivers were also ranked based on the number of customer complaints, picture opportunities, and customer contact opportunities. This information was published along with an overall performance score weekly in the "DSP Delivery Excellence Performance" ("scorecard").

56. The scorecard issued by Amazon on a weekly basis assigned a performance score for each DSP of Poor, Fair, Great, Fantastic and Fantastic Plus. Amos, through Kirk Amos LLC, and other DSPs were provided a bonus for achieving a Fantastic or Fantastic Plus score.

57. Under the DSP program, DSPs, including Amos, through Kirk Amos LLC, were not profitable unless the DSP achieved scores of Fantastic or Fantastic Plus and thereby obtained bonuses.

58. Amazon made bonus requirements nearly unattainable by Program Policy updates, thereby ensuring that Amazon and not the DSPs profited from the DSP program.

59. Amazon provided training to Amos in May 2019 in Seattle and in July 2019 in Chicago. The trainers provided the details of DSPs' expected earnings.

60. Amazon compensated Amos, through Kirk Amos LLC, for the transportation and delivery services she performed in three ways: 1) a fixed monthly fee to cover the cost of Amazon-branded vehicles, including payments to Element Financial, Inc. and insurance, 2) a per delivered package fee, which was determined based upon the achievement of certain parameters, and 3) a flat fee for each route completed, which was to cover driver's salaries. Amazon stated during Amos' Chicago training session that only the per delivered package fee was meant to be profit.

61. The Program Policy updates significantly changed both the DSP reimbursement policy and day to day operational requirements, including reimbursement, dispatch time and requirements as well as route distribution.

62. Program policies updates made after Amos, through Kirk Amos LLC, began operation essentially rendered her as well as other DSPs unprofitable unless extremely high-performance metrics were reached, the provision of which increased risks to driver safety. For example, to achieve a profit, a "Fantastic Bonus" was necessary.

63. Instead of paying DSPs fairly, Amazon relied on the federal government's Paycheck Protection Program (PPP) to keep DSPs operational, thereby using taxpayer's money to pay for its operations. On information and belief, nearly all DSPs are currently operating at a loss due to Amazon's control of the DSP program and rely on PPP funds to stay afloat. Amazon knows this because it performs an annual financial review of most DSPs' accounting records.

64. On information and belief, DSPs earned, on average about $25 in revenue per route completed, with about 20 routes being completed daily per DSP. This revenue was used to cover the aforementioned unreimbursed expenses.

65. To be "Fantastic" a DSP had to achieve the following: 99.56% delivery completion rate, 99.2% photo acceptance, 99.6% scan compliance, 99.5% contact compliance, attrition of less than 1%, customer experience of over 99%, customer delivery feedback positive of over 99%, 99% work hour compliance (delivery completion within 11 hours), among other metrics, despite many of these metrics being out of the control of the DSP.

Case 1:22-cv-00055   Document 1   Filed 01/24/22   Page 13 of 54

66.    Amazon designed routes without regard to the difficulty drivers would experience attempting to deliver using the route.  Amos, through Kirk Amos LLC, was not allowed to alter the delivery route, expected delivery speed, or package count.

67.    After dictating the routes in fine detail, Amazon often penalized Amos and her drivers for failure to achieve a 99.6% delivery completion rate, the rate required to achieve a "Fantastic" score, despite business closures, dogs, traffic, and weather considerations. Amazon penalized drivers despite and contrary to its policies directing drivers not to deliver in adverse situations.  Nor was the rate not achievable within ten hours if a driver took required meal and rest breaks.

68.    Amazon required both Amos her drivers to explain why any package was returned to the station at the end of a driver's shift.  Amazon routinely threatened drivers with suspension or termination if they did not go back out to attempt redelivery of 100% of dispatched packages, even if the driver had been on the road more than ten hours.

69.    Amazon set the start time and end time for drivers and dictated the hours of delivery in which a delivery driver could deliver a package, including the start time and end time for each route.  For example, employees of Amazon sent delivery drivers text messages when they approached ten hours.

70.    Amazon employees also directed DSP employees, including Amos' drivers, to cease delivering or to continue delivering.  On more than one occasion, Amos' drivers were called back to the station and told not to deliver packages well before the drivers' shifts had ended.

14

71.     Amazon made direct contact with Amos' drivers despite requests from Amos and her supervisory team not to do so, often directing them to re-attempt redelivery, to continue or stop delivering, or to send the drivers to help other drivers delivering Amazon Prime packages to customers, including drivers that did not work for Amos or Kirk Amos LLC. If a driver stopped for more than five minutes the tracking system would send an alert and a DRT1 employee would call an Amos' supervisor and the driver directly ordering the driver to keep moving.

72.     Amos and her co-employees were only allowed to hire drivers and other employees if Amazon approved. Amazon was required to pre-approve all hires, and routinely overrode and rejected employment offers made to drivers by Amos and her co-employees. In contrast, Amazon routinely required an explanation from Amos for terminations or failure to hire drivers who applied for work. Amazon threatened to terminate the relationship with Amos if she did not comply with Amazon's human resources "recommendations."

73.     Amazon required Amos and her co-employees to run background checks on new hires using companies Amazon selected. Amazon reviewed the background checks before approving or rejecting a new hire. Amos, through Kirk Amos LLC, paid a fee for each background check. Amazon did not reimburse Amos or Kirk Amos LLC for the background checks.

74.     Amazon audited and controlled the content of Amos' employment applications, offers of employment, and employee handbooks.

Case 1:22-cv-00055   Document 1   Filed 01/24/22   Page 15 of 54

75.    Amazon supervised and provided performance evaluations for all Amos' drivers, and disciplined her drivers for alleged violations of Amazon's requirements, policies, and procedures.

76.    Amazon controlled whether Amos' drivers were disciplined, retrained, or terminated.  At Amazon's sole discretion, it subjected selected drivers to additional training for complying with its operational procedures and its work expectations.  Amos, through Kirk Amos LLC, was required to pay for the employee's time during these training sessions.

77.    Amos, through Kirk Amos LLC, was not allowed to appeal or challenge Amazon's decision to discipline, retrain, or even terminate "her" drivers.

78.    Amazon frequently and arbitrarily punished Amos, through Kirk Amos LLC, for petty matters, which negatively affected her ability to achieve bonuses.  For example, drivers would be forbidden from delivering a route by Amazon for not wearing a complete uniform, wearing unbranded hats, or having a small rust stain on the delivery van.

79.    Amazon required Amos, through Kirk Amos LLC, to increase or decrease the number of drivers employed at any given time and to increase or decrease routes by up to 100% with 14-days' notice.  As a result, Amos, through Kirk Amos LLC, had to terminate dozens of drivers without cause, making them eligible for unemployment insurance benefits.  Amazon then required Amos, through Kirk Amos LLC, to provide these benefits without reimbursement.

80.    Amazon did not allow DSP drivers to work for more than one DSP at a time.

16

81.    Amazon required Amos, through Kirk Amos LLC, to lease Amazon-branded delivery vehicles (branded with Amazon trademarks) exclusively from Element Financial, Inc.  The number, timing, and types of vans provided by Element to Amos was solely decided by Amazon.  Amos sometimes received van deliveries with no advance notice from Element or Amazon.  All increases or decreases to Amos' delivery van fleet required approval from Amazon.

82.    On information and belief, Amazon, through Element, charges $6,000 on average per Amazon-branded vehicle upon termination of DSP contracts.  As such, many DSPs are left with over $120,000 in "exit fees."

83.    Amazon directed Element on end of contract leased branded-vehicle returns.

84.    Upon information and belief, Amazon provides guidelines to Element for vehicle returns, including but not limited to the amount charged for so-called excess wear and tear. Amazon provided the guidelines and hired inspectors for determining excessive wear and tear on branded-vehicles.  Amazon's guidelines require the branded-vehicles to be returned to an almost new condition to avoid excessive wear and tear fees.

85.    Amazon determined how much DSPs were charged for excessive wear and tear on branded-vehicles.

86.    Upon information and belief, Amazon directed Element to charge a DSP $3,500-$6,000 per leased vehicle ("exit fees") regardless of the condition of the vehicle.

87.    Amazon did not disclose the exit fees to Amos or other DSPs before Amos entered the Program Agreement.

88.    On information and belief, Amazon leadership uses these exit fees to keep DSPs who have voiced concerns about dwindling profits captive within the DSP program by making exit too expensive.  DSPs have openly voiced concerns about not being able to afford to leave the DSP program despite not earning a profit.

89.    Upon information and belief, Amazon has used the excess wear and tear fees as a bargaining tool to prevent exit by existing DSPs who would otherwise terminate their contract with Amazon.

90.    On information and belief, Amazon received a financial benefit from Element in exchange for requiring Amos and other DSPs to pay for and use its goods or services.

91.    Amazon required Amos, through Kirk Amos LLC, to make purchases through Amazon-authorized vendors only, including ADP or PayCom for payroll.

92.    Amazon routinely accessed and made changes to Amos' payroll without her permission and without notice, while PayCom refused to make changes to Amos' payroll without prior approval from Amazon.  Upon information and belief, at least 180 Amazon employees had full access to Amos' payroll and private employee records.

93.    DSPs, including Amos, through Kirk Amos LLC, did not supply the fuel used for Amazon deliveries.  Rather, Amazon paid all fuel charges by providing an Amazon debit gas card to each driver to purchase gasoline.

94.    Amazon also paid a daily rate to DSPs, including Amos, through Kirk Amos LLC, for vehicle lease payments, approved rental car payments, vehicle maintenance, delivery driver wages and bonuses, and DSP parking lot rental wages.  Amos, through Kirk Amos LLC, was economically tied exclusively to Amazon for all DSP business operations.

18

95.     Amazon set the minimum and maximum pay rates for drivers and reimbursed DSPs, including Amos, through Kirk Amos LLC, at a set hourly rate.  The rate did not cover actual time worked by the drivers.  Amazon reimbursed Amos only up to ten hours per day per driver despite knowing, through its own monitoring, that drivers took nearly twelve hours to complete routes on average.  Amos, through Kirk Amos LLC, was left having to pay for these overtime wages and additional costs without reimbursement from Amazon, despite Amazon's agreement to pay the drivers' wages.

96.     Amazon's refusal to assign reasonable routes with reasonable package counts caused significant financial damage to Amos, through Kirk Amos LLC, including the loss of employees, and damage to the scorecard when drivers were not able to fully complete the Amazon-assigned routes.  This directly affected Amos' eligibility for bonuses, limited potential business growth, and jeopardized future route assignments.

97.     Amazon's routes jeopardized the safety of Amos' drivers and the community because drivers sacrificed safety for speed to meet Amazon's demands.  Amos, through Kirk Amos LLC, lacked the control necessary to lessen the safety problems caused by Amazon.  In consequence, rushed deliveries put the public at risk, resulting in numerous collisions involving Amos' drivers which caused injuries and three "totaled" vehicles.  Amos, through Kirk Amos, LLC, bore the liabilities of these collisions.

98.     As detailed below, DRT1 management often required Amos, through Kirk Amos LLC, to provide "rescue'" to assist other drivers assigned to routes that were not able to be completed within twelve hours.  Amos, through Kirk Amos LLC, often provided rescue drivers.  Amazon refused to reimburse Amos, through Kirk Amos LLC for rescue drivers.

19

99.     Amazon provided a complaint hotline for drivers to complain about DSPs.  Amazon required Amos to respond to all complaints.

100.    Amos was required to attend regular meetings with DRT1 "on the road" Amazon team members.

101.    Amazon set and monitored maintenance standards for all vehicles using telemetrics and the delivery app, "Amazon Flex," used by delivery drivers to deliver Amazon packages.  Amazon forbade the use of any vehicle to deliver goods to its customers that did not meet its maintenance standards.

102.    Amazon did not require their DSPs to have any logistics experience. Amazon gave DSPs including Amos, through Kirk Amos LLC, access to Amazon's technology training resources, videos, and delivery data. Amazon also supplied them with business tools to assist with planning, daily operations, routing guidance, and customer service and provided consistent coaching and support, an operation manual, driver assistance, and a dedicated account manager.

103.    DSPs, including Amos, through Kirk Amos LLC, also interacted with and took instructions from Amazon's account managers, on-road assistance team, and Amazon delivery station personnel daily.

104.    Amos, through Kirk Amos LLC, paid drivers the amount dictated to it by Amazon. Amazon provided bonuses to Amos during peak periods, and required that such bonuses be paid directly to the drivers.

105.    Drivers were regularly scheduled to work five and six days per week, with shifts that were scheduled for ten hours.  Drivers sometimes worked seven days per week during

20

high volume periods.  Drivers routinely worked overtime to maintain the 99.6% delivery completion rate.

106.    Amazon's DRT1 employees frequently contacted Amos and pressured her to mandate that drivers work overtime: more than five days per week and longer than ten hours per day.

107.    Although shifts were scheduled for ten hours per day, the work-related activities Amos and her co-employees had to perform routinely took longer to complete.  Whenever this occurred, Amazon only reimbursed Amos, through Kirk Amos LLC, for a maximum of ten hours per day for each driver, leaving Amos to pay their overtime wages without reimbursing her.

108.    Amazon electronically tracked all time worked by Amos and her co-employees to the second.

109.    Drivers that were unable to achieve over a 96% delivery completion rate were scored "poor" on the scorecard and eventually terminated by Amazon. As a result, drivers frequently delivered packages off the clock, including but not limited to during unpaid lunch breaks and after they had clocked out for the day.

110.    Amos regularly worked more than sixty hours a week.  Amos was on call at all hours of the day and night, 365 days per year, often receiving over 100 communications and directions from Amazon daily.  Amos supervised and scheduled drivers, hired drivers, maintained Amazon-branded delivery vehicles, and completed human resource duties, among other tasks.  Amos also worked as a delivery driver, and completed routes throughout the relevant period, delivering packages to Amazon Prime customers.

21

111. Other DSPs routinely worked similar hours.

112. On average, Amos' drivers delivered between approximately 250-400 Amazon packages per shift and delivered packages eleven or twelve hours per day. Drivers for other DSPs routinely delivered a similar number of packages.

113. Even after Amos' drivers were finished delivering assigned packages, Amazon routinely assigned them to "rescue" other delivery drivers, including drivers who worked for other DSPs other than Kirk Amos LLC.

114. Amazon directed Amos' drivers to "rescue" other delivery drivers beyond the 10 hours which Amazon reimbursed Amos, through Kirk Amos LLC. As a result, Amos, through Kirk Amos LLC, was forced to pay the drivers' overtime without reimbursement from Amazon, even though Amazon, and not Kirk Amos LLC, required the overtime work.

115. Upon return to the Amazon delivery station, Amos' drivers had to unload their vehicles and check in with Amazon staff members concerning the day's route. Amos' drivers then had to park the Amazon-branded delivery vehicles at the separate off-site location. This also caused Amos, through Kirk Amos LLC, being forced to pay drivers' overtime without reimbursement from Amazon.

116. Amazon was not only aware of and permitted this practice, but the work schedules and conditions imposed by Amazon effectively required this practice.

117. Amazon required Amos, through Kirk Amos LLC, and other DSPs to provide health insurance to their drivers within 30 days of the driver's employment. Amazon also required Amos to supplement the health insurance provided to employees. Amazon did not

reimburse Amos, through Kirk Amos LLC, for the health insurance premiums paid on their behalf.

118.    Amazon did not compensate Amos, through Kirk Amos LLC, for meal breaks taken by her drivers, including Amos, despite knowing that drivers were delivering Amazon Prime packages during their required rest break when they were clocked out, and therefore were not being paid for their work.  Instead, Amazon required drivers to continue working through the meal breaks.  Amos, through Kirk Amos LLC, was forced to pay the drivers' time without reimbursement from Amazon.

119.    Amazon employees at DRT1 complained about Amos' drivers taking required meal breaks and often contacted her co-employees and/or the drivers directly to tell them to skip their breaks and continue delivering.

120.    Many of Amos' drivers refused to clock out for meal breaks because the drivers could not take the required breaks and meet Amazon's delivery standards.  Amazon issued breach of contract notices or warnings to DSPs, including Amos, through Kirk Amos LLC, for not forcing drivers to clock out for meal breaks.

121.    Amazon often cancelled routes without notice to Amos, through Kirk Amos LLC, and required her to pay for the driver's scheduled hours without reimbursing her for those hours.  Amazon only compensated Amos, through Kirk Amos, LLC, for drivers' time if they were actively working on a route, despite Amazon's policy that Amos had to pay them for additional hours caused by Amazon cancellations.

122.   Amazon fined Amos, through Kirk Amos LLC, for cancellations made with less than twenty-four-hour notice.  Amazon often refused to pay Amos for routes Amazon cancelled without twenty-four hours' notice.

123.   On information and belief, Amazon's failure to pay employee wages to Amos, through Kirk Amos LLC, was a willful scheme to avoid employer-related responsibilities and other legal liability while maintaining such complete operational control over drivers and DSPs that the true relationship was that of employer-employee.

124.   Under the DSP program, Amazon attempted to shift all liability associated with violation of labor and wage laws, as well as transportation and logistics laws and regulations, to Amos, through Kirk Amos LLC.  Worse, because Amazon maintained control of all operations and decision-making, Amos, through Kirk Amos LLC, was virtually powerless to reduce exposure and liability for the labor and wage laws.

125.   Despite treating them as fully-controlled employees of Amazon, Amazon did not pay legally-required wages or overtime to Amos or her drivers.  As a result, Amos, through Kirk Amos LLC, had to pay the drivers' overtime.  Amos herself worked as an Amazon employee but without being paid legally required wages.

126.   During the times material to this action, Amazon canceled two DSP contracts at the DRT1 station.  A notice of the cancellation was posted publicly in the station and the drivers and routes were divided amongst the remaining DSPs at DRT1.  On information and belief, this system allowed Amazon to cancel DSP contracts without disruption to its delivery services.  The system also demonstrated the true nature of DSPs and their drivers: employees rather than independent business enterprises.

127.    Amazon assigned a business coach to Amos, through Kirk Amos LLC, and to other DSPs to act as a liaison between Amazon and the DSP.  Todd Crowe was assigned as the business coach to Amos.  Crowe routinely failed to offer the same support to Amos that he offered to others.

128.    After Jake Allen began managing the station and Todd Crowe became the station's business coach, Amazon began a concerted effort to engage in outrageous, cruel, and harassing conduct to drive Amos out of the DSP program.  Two Amazon "on the road" team employees told Amos that Amazon employees instructed them to harass her and her DSP employees and to find any way to ground her drivers so that Amos would leave the DSP program.

129.    Amos complained at least twice to Chris Morem that Crowe emailed Amazon employees falsely stating that Amos was missing meetings.  Crowe also refused to accept phone calls from Amos.

130.    Amos repeatedly reported her concerns with Crowe to Morem and complained to Morem multiple times about the emotional pain inflicted upon Amos by Crowe.

131.    One issue discussed with Morem was Crowe's impact on her experience with Amazon and the disparate treatment from Crowe was preventing Amos and Kirk Amos LLC from having the same experience as other DSPs.  For example, Amos discussed how Crowe offered, in her presence, another DSP $10,000 for a station change, which was rejected by that DSP, but said he had no idea what Amos was speaking about when Amos asked for that station change, even without compensation.

25

132.   Crowe offered, in Amos' presence, to confirm the participation of another DSP in the Amazon's DSP program when the other DSP's insurance had been non-renewed by Aon Insurance ("Aon"), which allowed the other DSP to be renewed by Aon.  When Amos made the same request within minutes of Crowe's offer to a male DSP, Crowe told her that he was "not allowed to get involved with insurance."  As a result of Crowe's disparate treatment of Amos, Amos, through Kirk Amos LLC, was forced to seek insurance in the open market, which resulted in over $267,000 in losses for Amos.

133.   Although there was no lapse in insurance, DRT1 leadership grounded Amos' operations for five days during which Amos, through Kirk Amos LLC, was required to pay her drivers.  DRT1 also imposed penalties for dropped routes, despite program policies that only allow dropped route charges  when there is less than 24 hour's notice of a DSPs inability to service the route.   Crowe did not respond to Amos's requests for assistance/intervention in this matter.  This resulted in a loss of over $30,000.

134.   Amazon harassed Amos and her drivers regularly by grounding drivers and delivery vans without grounds.  Amazon instructed three members of the Amazon "on the road team" to do so.

135.   On one occasion, Amazon sent a station-wide communication falsely stating that one of Amos' drivers had been in a fatal accident and scolded Amos, through Kirk Amos LLC, for not reporting it.  No accident had occurred.  On information and belief, Amazon employees knowingly made the false statement for the purpose of harassing, defaming, and upsetting Amos.

Case 1:22-cv-00055   Document 1   Filed 01/24/22   Page 26 of 54

136.   While having a miscarriage, Amos was heading for surgery when Amazon employee Todd Crowe called her no less than 14 times, while continuing to send emails saying that he could not get in touch with her.  Crowe failed to answer return calls.

137.   Amazon employees harassed Amos by calling her personal phone unnecessarily and continually, on many days on average about every 15 minutes between 5:45 am until about 10:30 pm.   This repeated calling happened frequently, despite having two full time operations managers on staff.

138.   In April 2020, Amos filed a written complaint about the extreme conduct of the leadership at DRT1, as well as the discriminatory attitudes and bullying by DRT1 leadership.

139.   Amos had numerous meetings with area managers and Chris Morem about the conduct, which they universally agreed to be outrageous. The conduct did not stop.

140.   In August 2020, Morem told Amos that she no longer had to speak to Crowe and could speak directly to him about issues.  However, Crowe continued to contact Amos.

141.   On numerous occasions, Amazon sent investigators to film and photograph Amos' drivers during pre-work hours.  The investigators would interact with her drivers and employees on occasion and other times would hide on rooftops.

142.   Amazon's "on the road staff" often taunted and yelled at Amos' drivers during package load out.  If the drivers responded, Amazon wrote them up for discipline.

143.   Amazon employees made disparaging and false remarks about Amos and Kirk Amos LLC during weekly station-wide meetings, contacted her employees to encourage them to go to other DSPs, and restricted her employees from training classes without cause.

27

For example, Amazon employees falsely stated in a station-wide meeting that Amos and Kirk Amos LLC were refusing to take routes out of spite.

144. Amazon employees steered Amos' drivers to other companies to the detriment of Amos, through Kirk Amos, LLC. On information and belief, Amazon's lead driver trainer, Deonte Smith ("Smith"), approached Amos' newly hired drivers during and after their classroom training and told them that Amos, "was horrible" and that they should go work for someone else, particularly Valdivia Logistics. On at least two separate occasions, Smith called Amos' drivers to encourage them to stop working for her.

145. Amazon employees were informed of and failed to take action on the poaching of Amos' drivers during loading time at DRT1.

146. Smith stated publicly in front of DRT1 station leadership on more than one occasion, and without a legitimate business justification, that he believed Amos' contract with Amazon would be canceled. Smith sent emails to Amazon DRT1 leadership copying Amos and her co-employees stating the same.

147. On information and belief, Amazon took no actions against Smith for his conduct.

148. Smith's conduct was particularly harmful because of the large expenses involved in recruiting and onboarding drivers. His conduct and behavior caused Amos, through Kirk Amos LLC, to drop routes and to lose money.

149. On information and belief, Amazon audited Amos, through Kirk Amos LLC, as a means of harassment. Amazon audited her approximately eight times in a single year while auditing other DRT1 DSPs just once on average.

150.    During one audit, Amos was threatened by an auditor, Kevin Jackson ("Jackson"), who stated that Amos needed to recognize his power to ruin her.  Crowe was on that call as well as Sophia Betcher.

151.    Amos was informed on numerous occasions that Amazon employees made disparaging remarks about her and Kirk Amos LLC.

152.    Amazon held Amos' drivers to standards which it did not require for other drivers for other DSP's at DRT1.  Amazon consistently suspended her drivers for allegedly violating undisclosed or made-up standards.

153.    Amazon did not provide Amos, through Kirk Amos LLC, with parking for her vans despite providing parking to most other DSPs.

154.    Amos' vans were vandalized on six different occasions.  Amos reported the incidents to Amazon.  Amazon refused to provide security.

155.    Amazon's DRT1 leadership frequently and consistently failed to pay Amos for completed routes.  This issue was reported to Crowe and Morem.  Nearly every invoice issued was appealed by Amos, through Kirk Amos LLC, during all times relevant to this matter.

156.    In February 2021, Amos received a letter of intent to purchase Kirk Amos LLC and take over her participation in the DSP program for more than one million dollars ($1,000,000).  Amos communicated the terms of the offer to Crowe and Morem.

157.    On information and belief, Amazon employees and agents sought to prevent the offer from being consummated by fabricating false grounds for terminating the Program Agreement.

Case 1:22-cv-00055   Document 1   Filed 01/24/22   Page 29 of 54

158.   In March 2021, Amazon grounded Amos' entire fleet citing non-existent "maintenance" requirements.

159.   During the week of March 15, 2021, Amazon grounded nearly one-third of Amos' delivery vehicles for alleged maintenance issues.  None of the grounded vehicles had been inspected by Amazon on the days they had been grounded.  Amos realized the vans were grounded when drivers drove the vans to the DRT1 station but were blocked by Amazon employees from loading the vans with packages.

160.   During the week of March 15, 2021, an Amazon employee that was new to DRT1, Cornell Causey ("Causey"), called Amos to inform her that he had been told not to unground her delivery vehicles to teach "her a lesson."  Causey told Amos that he told Sean Donovan that he had grounded the vans for no reason and that he needed to unground the vans, as it was impossible for Amos to do so.  He informed Amos that the grounding was targeted and asked what she had done to "piss them off."  He said he had never seen this and that he had been instructed not to unground the vans in the delivery software to teach Amos a lesson.  He was instructed to tell Amos that he could not unground the vans, which would result in thousands of dollars in fines and losses.

161.   This was the second day in the row this had happened, and it immediately followed a day in which the vans were improperly grounded for allegedly failing to have phone mounts.  However, the vehicles had been inspected for phone mounts the previous evening by Amazon and were 100% compliant.  Amazon employee Jake Allen reported falsely that the vehicles lacked phone mounts despite Amos and her team showing them to him.  Amos literally stood there with one in hand, only for Allen to state that said he did not see it.

30

162.    The conversation with Causey was reported to Allen.  Causey later ungrounded the vans, which allowed Amos, through Kirk Amos LLC, to use the vans for deliveries.  Even so, Amazon assessed dropped route fees against Amos, through Kirk Amos LLC, when the vehicles could not be used for deliveries on the days they were grounded without cause.

163.    On or about March 15, 2021, Amazon employees directed Otto Otterman and Sheyla Rojas, two non-English speaking co-employees of Amos, to falsely indicate dents in the body of two Amazon-branded delivery vehicles in the Amazon Flex app during morning load out, which Amazon later claimed were breaches of contract.  Because the employees did not speak English, they did not know what they were being asked to indicate in the Amazon Flex app and simply did as they were directed.

164.    Both repair reports were later deleted as the employees indicated that they were told by Amazon DRT1 "on the road" employees to indicate damage to the vehicle that did not exist.  This was reported to Morem, as well as to Amazon Human Resources.

165.    Amazon's DRT1 leadership frequently and consistently failed to timely update Amos' vehicle fleet maintenance, which lowered her scorecard rating and reduced her revenue.  This issue was reported to Crowe and Morem, but neither took action.

166.    In a Chime teleconference on April 7, 2021, between Amazon/ALI employees and agents Christopher Morem ("Morem"), Allen, another Amazon/ALI representative, Jasmine Bowles, an Amos', through Kirk Amos LLC co-employee, and Amos, Morem informed Amos that the Program Agreement would be terminated in 30 days, allegedly for breach.

167.    The Program Agreement provides, in relevant part:

31

*Amazon may terminate this Agreement by providing written notice to your Company, (A) if your Company breaches this Agreement (including, for the avoidance of doubt, any Program policy) and fails to cure the breach (if the breach is capable of being cured) within 30 days of receiving written notice of the breach from us, (B) if your Company fails to meet the Service Level Standards set out in the Program Policies for a sustained period of time, as defined in the Program Policies. . . (F) if your Company repeatedly breaches this Agreement (including, for the avoidance of doubt, any Program policy), whether or not your Company cures one or more of the breaches, . . . (I) if your Company fails to timely pay any amounts that are due and payable to any employee or third-party vendor (including any vendor in connection with any VAS Program).*

168.    Morem stated that the contract was being terminated for three alleged breaches of the Agreement.

169.    Amazon terminated Amos' access to its onboarding/hiring portal that same day.

170.    Morem claimed that the three alleged breaches were failure to pay employees timely, failure to maintain auto insurance, and failure to properly maintain vehicles.

171.    Amos received only two breach of contract notices, which were both disputed and cured within the stated cure period.

172.    Morem stated that the terms of the termination were not negotiable.

173.    Amazon's stated grounds for terminating the contract were false.

174.    With respect to the first alleged grounds, Amos, through Kirk Amos LLC, employed approximately 450 drivers during the term of the Program Agreement, which were all timely paid.

175.    On September 17, 2020, Amos received an email alleging a breach of contract for failure to pay a former employee, Raymond Christian ("Christian").  The notice provided a cure period of one day.

32

176.    Amos' human resources employees were reasonably not aware that Christian had not been properly paid because Christian had not clocked in or out during the period of non-payment and had also failed to sign in or out for the day.

177.    Amos' human resources employee immediately contacted Christian requesting his unpaid hours.  Amos, through Kirk Amos LLC, fully paid Christian on September 17, 2020, the same date of the notice, for the unpaid hours.

178.    A copy of Christian's paycheck stub was sent to Casey Hand, of Amazon Compliance, as well as Todd Crowe on September 17, 2020, demonstrating the payment.

179.    On September 22, 2020, despite the cure, Amazon falsely issued a breach of contract notice for the already-cured nonpayment with a cure date of September 25, 2020.

180.    With respect to the second alleged grounds, Amos, through Kirk Amos LLC, did not experience any lapse in auto insurance coverage.

181.    Amos, through Kirk Amos LLC, obtained an auto insurance policy which expired on Saturday, August 1, 2020.

182.    Amos, through Kirk Amos LLC, entered into a second auto insurance policy which had a term beginning August 1, 2020.

183.    Murphy Holderness, Amos' auto insurance agent, sent confirmation to Todd Crowe, Amazon's business manager, and Jeff Rogers ("Rogers"), an Amazon Compliance employee, that Amos' fleet was insured and that there would not be a lapse in auto insurance coverage.

184.    A final certificate of insurance (COI) was provided to Crowe and Rogers on August 4, 2020 after edits to the COI were requested by Jeff Rogers earlier that week.

185.    With respect to the third alleged grounds, Amazon's allegations were groundless and pretextual.

186.    Amazon consistently scored Amos, through Kirk Amos LLC, with the highest rating in vehicle maintenance.

187.    Amazon's DRT1 leadership and employees routinely grounded Amos' vehicles citing non-existent maintenance and repair requirements.  Two different members of the DRT1 "on the road team" told Amos that they had been directed to look for any reason to ground her vehicles.  While reported to Crowe and Morem, neither took any action.

188.    Amazon's DRT1 leadership and employees threatened Amos about once per month with contract termination for driving grounded vehicles which were not actually grounded.

189.    Amazon falsely alleged that Amos' entire fleet was missing removable cell phone mounts.

190.    In addition to the above false allegations of breach of contract, Amazon issued Amos, through Kirk Amos LLC, a breach of contract notice for failing to require drivers to sign into EMentor, a safe-driving monitoring application.  Amazon "on the road team" members alleged that Amos failed to respond to an inquiry, which Amazon sent to a nonexistent email address: ahaji@amazon.com.  However, Amazon DSPs and drivers are not issued or allowed to use amazon.com email addresses and all other messages had been sent to the proper address.  The Amazon employee who issued the notice refused to provide data supporting the allegations until after three weeks of Amos' bonuses were blocked. The data showed no violations but instead showed that the alleged incidents of van movements without EMentor monitoring were for operations in which use of the

34

application was not required.  While Amazon removed the breach of contract notice, Amazon failed to reimburse Amos, through Kirk Amos LLC, for the missed bonuses worth over $30,000.

191.    Amazon also falsely issued Amos, through Kirk Amos LLC, a breach of contract notice for allegedly failing to provide health insurance to her drivers.  In fact, Amos was providing health insurance as required.  On information and belief, Amazon issued this notice to all DSPs that were providing health insurance outside of Amazon's PrimeBen insurance service, which many DSPs had found to be more expensive than other options. The notice was later retracted.

192.    Amazon instructed Element to charge excessive exit fees for leased vans to keep DSPs captive participants in the DSP program.  Amazon has responded to DSP complaints about the DSP program, including complaints about having  to operate without a profit due to Amazon's control and reimbursement policies, by informing the DSPs that they cannot afford to leave the program due to the exit fees.

193.    Amazon has so far charged Amos, through Kirk Amos LLC, $19,000 in exit fees each for multiple vans.  These exit charges exceed the market price of the vans.

194.    Amazon supervises, manages, and controls Element employees who perform Amazon van inspections, providing the guidelines by which the inspectors evaluate the vans, and determining the costs assessed to DSPs based on the evaluation.

## COUNT ONE
### WILLFUL VIOLATION OF FAIR LABOR STANDARDS ACT (FLSA)

195.    All previous paragraphs are incorporated and realleged as though fully set forth herein.

196.    At all relevant times, Amazon employed individuals engaged in commerce or in the production of goods for commerce and/or handling, selling, or otherwise working on goods or materials that have been moved in or produced in commerce by any person, as described by 29 U.S.C. §§ 206-207.

197.    Amazon's annual gross sales exceed $500,000.

198.    Amazon required Amos, through Kirk Amos LLC, to register under the Department of Transportation as an interstate transportation company.

199.    At all times material to this action, Amazon acted, directly, indirectly, in the interest of an employer or joint employer with respect to Amos, an individual employee within the scope of the FLSA 29 U.S.C. Sec. 206 and 207.

200.    At all times material to this action, Amazon was an employer with the defined scope of the FLSA 29 U.S.C. Sec. 203(d) and an enterprise engaged in related activities performed through a unified operation or common control for a common business purpose, and engaged in commerce in that Amazon employed drivers and DSPs that engaged in commerce as defined by the FLSA 29 U.S.C. Sec. 203(s).

201.    The FLSA requires that covered employees be compensated for all hours worked in excess of forty (40) hours per week at a rate not less than one and one-half (1 ½) times the regular rate at which he is employed. See 29 U.S.C. § 207(a)(1).

202.    Amazon is subject to the wage requirements of the FLSA because Amazon is an "employer" under 29 U.S.C. § 203(d).

36

203.    At all relevant times, Amazon was an "employer" engaged in interstate commerce and/or in the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. § 203.

204.    During all relevant times, Amos and her drivers were covered employees entitled to the above-described FLSA protections. *See* 29 U.S.C. § 203(e).

205.    Amos and her drivers were not exempt from the requirements of the FLSA.

206.    Amos is entitled to be paid unpaid wages and overtime compensation for all hours worked over forty (40) in a workweek pursuant to 29 U.S.C. § 207(a)(1) and 29 C.F.R. § 778.112, both for the hours she worked personally and for the hours of her drivers, which she had to pay through Kirk Amos LLC because Amazon refused to do so.

207.    Amazon's compensation scheme applicable to Amos and her drivers failed to comply with either 29 U.S.C. § 207(a)(1) or 29 C.F.R. § 778.112.

208.    Amazon knowingly failed to compensate Amos and her drivers for all hours worked and failed to pay proper overtime premiums at a rate of one and one-half (1 ½) times their regular hourly wage, in violation of 29 U.S.C. § 207(a)(1) and 29 C.F.R. § 778.112.

209.    Amazon also failed to make, keep, and preserve records with respect to Amos sufficient to determine her wages, hours, and other conditions of employment in violation of the FLSA. 29 U.S.C. § 211(c); 29 C.F.R. §§ 516.5(a), 516.6(a)(1), 516.2(c).

210.    In violating the FLSA, Amazon acted willfully and with reckless disregard of clearly applicable FLSA provisions.

Case 1:22-cv-00055    Document 1    Filed 01/24/22    Page 37 of 54

211.  By failing to pay Amos and her drivers, Amazon has willfully and recklessly violated federal wage laws by improperly attempting to shift liability for its business practices to Amos and DSPs.

212.  Amazon deceptively mandated that DSPs interpose a business entity between Amazon and its individual DSPs and their drivers as part of its scheme to improperly shift its FLSA liability to its DSP employees.

213.  Pursuant to 29 U.S.C. § 216(b), employers such as Amazon, who intentionally fail to pay an employee wages in conformance with the FLSA, shall be liable to the employee for unpaid wages, liquidated damages, court costs and attorneys' fees incurred in recovering the unpaid wages.

214.  As a proximate result of Amazon's violation of the Fair Labor Standards Act, Amazon is liable for damages to Amos, through Kirk Amos LLC, including unpaid wages, liquidated damages, court costs and attorneys' fees incurred in recovering the unpaid wages, for an amount to be determined by a jury, but in any event in excess of $25,000.00 and the jurisdictional minimum of 28 U.S.C. § 1332.

## COUNT TWO
## BREACH OF CONTRACT

215.   All previous paragraphs are incorporated and realleged as though fully set forth herein.

216.  The Program Agreement was a valid and binding agreement between Amos, through Kirk Amos LLC, and Amazon.

Case 1:22-cv-00055   Document 1   Filed 01/24/22   Page 38 of 54

217.     The Program Agreement only permitted Amazon to terminate for breach of its terms by Amos, through Kirk Amos LLC, as more specifically alleged herein.

218.     At all relevant times, Amos, through Kirk Amos LLC, fulfilled its obligations under the Program Agreement and did not breach its terms.

219.     Amazon breached the Program Agreement by its actions alleged herein, including terminating the Program Agreement for knowingly false and fabricated reasons.

220.     In addition, every contract imposes on the parties an implied duty of good faith and fair dealing in the performance of their contract so that each may obtain the full benefit of performance.

221.     Amazon portrayed the DSP program to be one of mutual benefit to Amos and Amazon, and Amos, through Kirk Amos LLC, entered into the program for the mutual economic benefit of the parties.

222.     Amos entered the Program Agreement expecting to have a fair opportunity to enjoy the benefit of the advertised opportunity and to work collaboratively and in good faith with Amazon.

223.     It was reasonable for Amos, through Kirk Amos LLC, and other DSPs to expect to make a reasonable profit when performing the Program Agreement.

224.     Amos, through Kirk Amos LLC, had a reasonable expectation that Amazon would act in good faith and would not act  arbitrarily and unfairly with respect to bonus eligibility, and issuance of penalties, route allocations, package count distribution, enforcement of rules or policies, reimbursement, training, hiring and termination and/or discipline of her drivers, that Amazon would not act in ways that allowed Amazon to have complete control

39

over Amos' business operations, that Amazon would not shift costs and liabilities onto Amos, while maintaining such complete control, and that Amazon would refrain from acting in ways that make it unreasonably difficult or impossible for Amos to succeed and receive the benefits that Amos was entitled to under the Program Agreement.

225. Amazon breached the duty of good faith and fair dealing by:

a) acting arbitrarily with respect to bonus eligibility;

b) arbitrarily penalizing Amos and selectively enforcing some of its rules against Amos but not against other DSPs;

c) issuing bogus breach of contract notices and later retracting them without payment of the bonuses that were due during the periods of supposed non-compliance;

d) unilaterally changing route allocations without sufficient notice to Amos when it benefitted Amazon, and forcing Amos to pay drivers that had shown up for work despite Amazon's refusal to reimburse Amos for that expense as stated in the Program Agreement;

e) failing to reimburse Amos for additional costs that Amos incurred as a result of Amazon's unilateral decisions and Program Policies;

f) shifting all safety risks and liabilities to DSPs including Amos, while controlling every aspect of the driver experience, including issuing exceedingly high package counts to drivers;

g) interfering with Amos' business relationships with third party vendors and with her employees;

40

h) acting in ways that increased costs for Amos but prohibiting Amos from making changes to mitigate or reduce those costs and failing to reimburse Amos for those additional costs; and

i) exposing Amos to significant and unreimbursed legal liabilities.

226. As a proximate result of Amazon's breach of contract, Amazon is liable for damages to Amos, through Kirk Amos LLC, for an amount to be determined by a jury, but in any event in excess of $25,000.00 and the jurisdictional minimum of 28 U.S.C. § 1332.

**COUNT THREE**
**UNJUST ENRICHMENT**

227. All previous paragraphs are incorporated and realleged as though fully set forth herein.

228. Amazon designed and administered its DSP program such that it unilaterally controlled and changed the material terms to prevent DSPs such as Amos, through Kirk Amos LLC, from being compensated for the benefits they conferred on it.

229. Amos, through Kirk Amos LLC, conferred benefits on Amazon, with its knowledge, under circumstances where it would be inequitable for Amazon to retain the benefits without paying Amos their value.

230. Amazon has been unjustly enriched at the expense of Amos, through Kirk Amos LLC.

231. As a proximate result of Amazon's unjust enrichment, Amazon is liable for damages and restitution to Amos, through Kirk Amos LLC, for an amount to be determined by a

jury, but in any event in excess of $25,000.00 and the jurisdictional minimum of 28 U.S.C. § 1332.

## COUNT FOUR
## UNFAIR AND DECEPTIVE TRADE PRACTICES

232. All previous paragraphs are incorporated and realleged as though fully set forth herein.

233. In the alternative to or to the extent not precluded by an employer-employee relationship as pled herein, Amazon's actions were in or affecting commerce.

234. Amazon's actions as pled herein were unfair, deceptive, fraudulent, malicious, outrageous, unjust, unscrupulous, abusive, and oppressive.

235. The circumstances surrounding Amazon's breach of contract were egregious and aggravated.

236. As a proximate result of Amazon's unfair and deceptive trade practices, Amazon is liable for actual and treble damages under N.C.G.S. § 75-1.1 *et seq.* to Amos, through Kirk Amos LLC, for an amount to be determined by a jury, but in any event in excess of $25,000.00 and the jurisdictional minimum of 28 U.S.C. § 1332, and for reasonable attorneys' fees under N.C.G.S. § 75-16.1.

## COUNT FIVE
## FRAUD

237. All previous paragraphs are incorporated and realleged as though fully set forth herein.

238.  Amazon represented to potential DSPs, including Amos, that the DSP program would enable her to run her own business, be her own boss, and earn at least $75,000 per year through a business partnership with Amazon.

239.  Amos would not have entered into the Agreement with Amazon had she known:

> a.  These representations were false;
>
> b.  Amazon intended to and would unilaterally change the material terms of the contract to the detriment of Amos and Kirk Amos LLC.
>
> c.  Amazon intended to and would exercise complete operational control over her business and that she would not and could not run her own business;
>
> d.  Profits would be non-existent for meeting Amazon's standards, and that Amazon would set the bar so high that the standards were not reasonably achievable;
>
> e.  Amazon would build exorbitant exit fees into the program with respect to Amazon-branded vans.

240.  Amazon knowingly made materially false representations and/or knowingly concealed material facts to mislead Amos and Kirk Amos LLC regarding the true nature of the DSP Program, including but not limited to failing to disclose expenses that were not reimbursed by Amazon, the extreme level of operational control Amazon held over Amos, through Kirk Amos LLC, and other DSPs, the changes to Program policies, and falsely representing to Kirk Amos LLC that Amazon would act in good faith.

241.  Amazon knew that its materially false representations and concealment of material facts would reasonably induce reliance by Amos, through Kirk Amos LLC.

242.    Amos, through Kirk Amos LLC, reasonably relied upon Amazon's false representations and material omissions.

243.    As a direct and proximate result of Amazon's omissions and misrepresentations as to material terms of the Agreement, particularly those related to reimbursement and expenses related to business operations, Plaintiffs suffered damages.

244.    As a direct and proximate result of Amazon's fraudulent conduct, Amos and Kirk Amos LLC have been injured and Amazon is liable for compensatory damages to Amos, through Kirk Amos LLC, for an amount to be determined by a jury, but in any event in excess of $25,000.00 and the jurisdictional minimum of 28 U.S.C. § 1332.

245.    Amazon acted with fraud and malice and, on information and belief, its officers, directors, or managers participated in or condoned its fraudulent and malicious conduct. In consequence, Amos and Kirk Amos LLC are entitled to punitive damages from Amazon under N.C.G.S. § 1D-15 for an amount to be determined by a jury, but in any event in excess of $25,000.00 and the jurisdictional minimum of 28 U.S.C. § 1332.

## COUNT SIX
## VIOLATION OF WASHINGTON'S FRANCHISE INVESTMENT PROTECTION ACT (RCW 19.100 et seq.))

246.    All previous paragraphs are incorporated and realleged as though fully set forth herein.

247.    In the alternative to or to the extent not precluded by an employer-employee relationship as pled herein, Plaintiffs plead as follows.

248.    Amazon is a franchisor under RCW 19.100.010(10).

249.    Amos, through Kirk Amos LLC, was a franchisee under RCW 19.100.010(9).

250.   Amazon sold Amos, through Kirk Amos LLC, a franchise under RCW 19.100.010(6) when the parties entered into the Program Agreement.

251.   Pursuant to the Program Agreement, Amos, through Kirk Amos LLC, was granted the right to engage in the business of offering, selling, or distributing services under a marketing plan prescribed or suggested in substantial part by Amazon, the operation of Kirk Amos LLC was substantially associated with a trademark, i.e. Amazon-branded vans and driver uniforms, owned by Amazon, and Amos, through Kirk Amos LLC, paid, a $10,000 franchise fee to enter into the business with Amazon.

252.   Amazon required Amos, through Kirk Amos LLC, to pay Element Financial, Inc. for services, to pay PayCom for services, which were not priced at fair market value and imposed arbitrary penalties and fines against Amos, through Kirk Amos LLC, in order to continue to do business with Amazon.  On information and belief, Amazon received an economic benefit from either Element Financial, Inc., PayCom or both, for Amos' use of its services.

253.   On information and belief, ALI, Amazon, or the DSP program are not registered as a franchise in any U.S. state or territory.

254.   Amazon failed to provide Amos, through Kirk Amos LLC, with a franchise disclosure document.

255.   Amazon failed to provide Amos, through Kirk Amos LLC, with financial performance representations.

256.   Amazon was required to register as a franchise, but failed to do so prior to selling the franchise to Amos, through Kirk Amos LLC, pursuant to RCW 19.100.010(10).

45

257.    Amazon's sale of a franchise to Amos, through Kirk Amos LLC, originated from Washington state and Amazon resides and has its principal place of business in Washington state.

258.    Pursuant to RCW 19.100.080(1), it is unlawful for any person to sell a franchise that is registered or required to be registered without first furnishing the prospective franchisee a copy of the franchisor's current franchise disclosure document.  Amazon did not provide a franchise disclosure document to Plaintiffs.

259.    Pursuant to RCW 19.100.070, it is unlawful for any person in connection with the offer, sale or purchase of any franchise in Washington state, to sell or offer to sell by means of any written or oral communication that includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements not misleading. Amazon wrongfully provided untrue material statements or omitted material facts necessary to make the statements not misleading, including but not limited to when it portrayed the DSP program as an opportunity for DSPs, including Amos, to own their own businesses without unreasonable interference and control by the Defendant, when it falsely represented to Amos that Amazon would not act in ways that would limit Amos' reasonable opportunity to receive the benefit of the advertised bargain, when if falsely represented to Amos that Amos would have the authority and autonomy to make business decisions, and when it mislead Amos into believing that Amazon would reimburse Amos for driver's salaries, and when it otherwise made false representations and material omissions as pled herein.

46

260. Pursuant to RCW 19.100.180(2)(h), a franchisor may not impose on a franchisee obligations that are not reasonable and necessary. Amazon imposed burdensome, unreasonable, and unnecessary obligations on Plaintiffs in violation of RCW 19.100.180(2)(h).

261. Pursuant to RCW 19.100.180(2)(b), a franchisor may not require a franchisee to purchase or lease goods or services of the franchisor, or from approved sources of supply, unless and to the extent that the franchisor satisfies the burden of proving that such restrictive purchasing agreements are reasonably necessary for a lawful purpose justified on business grounds, and do not substantially affect competition. On information and belief, Amazon wrongfully required Plaintiffs to purchase or lease goods or services from approved sources, including Element Fleet, PayCom, and others, without proving that such restrictive purchasing agreements were reasonably necessary for a lawful purpose justified on business grounds, and did not substantially affect competition.

262. Pursuant to RCW 19.100.180(2)(e), a franchisor may not obtain money, goods, services, anything of value, or any other benefit from any other person with whom the franchisee does business on account of such business unless such benefit is disclosed to the franchisee. On information and belief, Amazon violated this provision with respect to services required to be purchased through Element, PayCom, and other companies.

263. Parties to a franchising agreement have a statutory duty to deal in good faith pursuant to RCW 19.100.180(1). Amazon did not deal with Plaintiffs in good faith during the term of the Agreement.

264. Pursuant to RCW 19.100.180(2)(c), a franchisor may not arbitrarily discriminate between franchisees in the charges offered or made for royalties, goods, services, equipment, rentals, advertising services, or in any other business dealing. Amazon repeatedly and arbitrarily treated Amos, through Kirk Amos LLC, less favorably in its business dealings than it did other DSPs at DRT1.

265. Pursuant to RCW 19.100.180(2)(j), a franchisor may not terminate a franchise prior to the expiration of its term except for good cause. Amazon prematurely and wrongfully terminated Plaintiffs' franchise in violation of RCW 19.100.180(2)(j).

266. Amazon's violations of RCW 19.100 *et seq.* proximately caused damage to Plaintiffs in an amount to be determined by a jury, but in any event in excess of $25,000.00 and the jurisdictional minimum of 28 U.S.C. § 1332.

267. As a proximate result of Amazon's violations of RCW 19.100 *et seq.*, Amazon is liable to Plaintiffs for damages, including damages for unfair and deceptive trade practices under both Washington law, including RCW 19.100.190, and Washington's Consumer Protection Act, RCW 19.86 *et seq.*, and North Carolina law, including N.C.G.S. § 75-1.1 *et seq.* Plaintiffs are therefore entitled to treble damages and attorneys fees.

## COUNT SEVEN
### VIOLATION OF ILLINOIS FRANCHISE DISCLOSURE ACT OF 1987
### (815 ILCS 705/26)

268. All previous paragraphs are incorporated and realleged as though fully set forth herein.

269. In the alternative to or to the extent not precluded by an employer-employee relationship as pled herein, Plaintiffs plead as follows.

48

270.     Amazon is a franchisor under 815 ILCS 705/3, but, on information and belief, is not registered as a franchisor in any U.S. State or territory.

271.     Amos was a franchisee under 815 ILCS 705/3.

272.     Amazon sold Amos a franchise under 815 ILCS 705/3 when the parties entered the Program Agreement as pled herein.

273.     Amazon offered and sold the franchise to Amos in Illinois while she was a citizen and resident of Naperville, Illinois.

274.     Amazon was required to register as a franchisor under 815 ILCS 705/5 but never did so.  As such, Amazon offered and sold the franchise to Amos in violation of 815 ILCS 705/5 and 815 ILCS 705/26.

275.     Amazon terminated the franchise without cause prior to the expiration of its term, in violation of 815 ILCS 705/19 and 815 ILCS 705/26.

276.     Amazon did not provide a franchise disclosure statement to Amos, in violation of 815 ILCS 705/5 and 815 ILCS 705/26.

277.     Amazon violated 815 ILCS 705/6 and 815 ILCS 705/26 with respect to the offering and sale of the franchise to Amos by providing untrue material statements or omitted material facts necessary to make the statements not misleading, including but not limited to when it portrayed the DSP program as an opportunity for DSPs, including Amos, to own their own businesses without unreasonable interference and control by the Defendant, when it falsely represented to Amos that Amazon would not act in ways that would limit Amos' reasonable opportunity to receive the benefit of the advertised bargain, when it falsely represented to Amos that Amos would have the authority and autonomy to make

49

business decisions, and when it mislead Amos into believing that Amazon would reimburse Amos for driver's salaries, and when it otherwise made false representations and material omissions as pled herein, and by engaging in acts, practices, and a course of business which would operate as a fraud or deceit upon Amos.

278.    Amazon's violations of the Illinois Franchise Disclosure Act of 1987 proximately caused damage to Plaintiffs in an amount to be determined by a jury, but in any event in excess of $25,000.00 and the jurisdictional minimum of 28 U.S.C. § 1332.

279.    As a proximate result of Amazon's violations of the Illinois Franchise Disclosure Act of 1987, Amazon is liable to Plaintiffs for damages, costs, and attorneys fees under 815 ILCS 705/26.

## COUNT EIGHT
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

280.    All previous paragraphs are incorporated and realleged as though fully set forth herein.

281.    Amazon, through its employees, intentionally subjected Amos to emotional distress when it subjected her to extreme and outrageous conduct including, frequent audits, extreme and uncharacteristic auditing, creating false breaches of contract, allowing Amazon employees to spoil her reputation, blocking her ability to hire, allowing employees to divert employees to other DSPs, subjecting her to frequent phone calls, followed by emails expressing the inability to reach her, despite those calls being returned, verbally insulting and harassing her during station-wide meetings, which resulted in anxiety attacks, high stress, and loss of multiple pregnancies.

50

282.   These acts were extreme, outrageous, concerted, exceeded all bounds of a civilized society, and were designed to harass and inflict emotional pain onto Amos or were carried out in reckless disregard as to whether it would inflict severe emotional distress upon Amos, or was certain to do so.

283.   Amos made Amazon aware of these extreme and outrageous acts yet it allowed them to continue.

284.   These acts, as alleged in this Complaint, were the foreseeable cause, and did proximately cause, Amos to suffer from severe physical and emotional distress, mental anguish, humiliation, embarrassment, and pain.

285.   As a result of the extreme conduct of Amazon employees, Amos had three miscarriages and required medical treatment (including medication) and counseling for severe emotional distress, including humiliation, grief, fear, anxiety and depression. The extreme conduct caused her to suffer insomnia, hair loss, extreme weight gain, and an increased severity in asthma symptoms, which required multiple hospital and clinic visits.

286.   Accordingly, Amos is entitled to compensatory damages for intentional infliction of emotional distress from Amazon for an amount to be determined by a jury, but in any event in excess of $25,000.00 and the jurisdictional minimum of 28 U.S.C. § 1332.

287.   These acts were committed by multiple Amazon employees under the direction of Allen, while he served as an area manager for Amazon and while acting within the scope of his employment, and Amazon was aware of such actions and further ratified Allen's behavior by taking no action to prevent it.

288. Amazon acted willfully and wantonly and with malice and, on information and belief, its officers, directors, or managers participated in or condoned its willful and wanton and malicious conduct. In consequence, Amos and Kirk Amos LLC are entitled to punitive damages from Amazon under N.C.G.S. § 1D-15 for an amount to be determined by a jury, but in any event in excess of $25,000.00 and the jurisdictional minimum of 28 U.S.C. § 1332.

**COUNT NINE**
**NEGLIGENT INTENTIONAL INFLICATION OF EMOTIONAL DISTRESS**

289. All previous paragraphs are incorporated and realleged as though fully set forth herein.

290. Amazon's acts as alleged herein were willful and wanton, reckless, grossly negligent, and negligent.

291. It was reasonably foreseeable that Amazon's acts as alleged herein would cause Amos severe emotional distress.

292. Amazon's acts as alleged herein proximately caused Amos to suffer from severe physical and emotional distress, mental anguish, humiliation, embarrassment, and pain.

293. Accordingly, Amos is entitled to compensatory damages for negligent infliction of emotional distress from Amazon for an amount to be determined by a jury, but in any event in excess of $25,000.00 and the jurisdictional minimum of 28 U.S.C. § 1332.

294. Amazon acted willfully and wantonly and with malice and, on information and belief, its officers, directors, or managers participated in or condoned its willful and wanton and malicious conduct. In consequence, Amos and Kirk Amos LLC are entitled to punitive

52

damages from Amazon under N.C.G.S. § 1D-15 for an amount to be determined by a jury, but in any event in excess of $25,000.00 and the jurisdictional minimum of 28 U.S.C. § 1332.

**JURY TRIAL DEMAND**
**PLAINTIFFS HEREBY DEMAND A JURY TRIAL FOR ALL ISSUES SO TRIABLE**

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray the Court order the following relief:

1.	Compensatory damages from Amazon Logistics, Inc. for Plaintiffs' claims in an amount to be determined by the jury at trial, but in any event in excess of $25,000.00 and the jurisdictional minimum of 28 U.S.C. § 1332.

2.	Punitive damages from Amazon Logistics, Inc. for Plaintiffs' claims in an amount to be determined by the jury at trial, but in any event in excess of $25,000.00 and the jurisdictional minimum of 28 U.S.C. § 1332.

3.	Treble damages from Amazon Logistics, Inc. under all applicable law;

4.	Reasonable attorneys' fees and litigation costs and expenses, under all applicable law;

5.	The costs of this action, as allowed;

6.	Pre- and post-judgment interest, at the legal rate;

7.	All other relief that the Court deems just and proper.

This is the 24th day of January, 2022.

*/s/ Danielle Barbour Wilson*
Danielle Barbour Wilson

NC State Bar No. 39516
dwilson@bankslawfirm.com
Jesse H. Rigsby, IV
NC State Bar No. 35538
jrigsby@bankslawfirm.com
The Banks Law Firm, P.A.
P.O. Box 14350
Research Triangle Park, NC 27709
Phone: (919) 474-9137
Fax: (919) 474-9537

*Attorneys for Plaintiffs*