**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**CASE NO. 1:22-cv-00055-CCE-JEP**

AHAJI AMOS and KIRK AMOS
DELIVERY AND COURIER, LLC

                              Plaintiff,

      vs.

AMAZON LOGISTICS, INC.,

                          Defendant.



# PLAINTIFFS' RESPONSE BRIEF TO DEFENDANT'S MOTION TO DISMISS AND COMPEL ARBITRATION PURSUANT TO RULE 12(B)(3)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………..…………ii

STATEMENT OF NATURE OF MATTER………………………………………………1

STATEMENT OF FACTS………………………………………………………………...2

    The DSP Program as Employment…………………………………………………2
    The Last Mile Delivery Process……………………………………………………8
    ALI Proffers a Different, Unexecuted Program Agreement………………………..9

ARGUMENT……………………………………………………………………………11

    Amos was ALI's Employee…………………………………………………………11
    Amos did not Assent to the Arbitration Clause……………………………………14
    The Arbitration Clause is not Enforceable Under the FAA…………………………17
    This Case Involves a "Contract of Employment"…………………………………19
    This Lawsuit is not Subject to Arbitration under Washington's
        Uniform Arbitration Act…………………………………………………...20

CONCLUSION……………………………………………………………………………24

WORD COUNT CERTIFICATION.…………………………………………………….25

CERTIFICATE OF SERVICE...…………………………………………………………26

# TABLE OF AUTHORITIES

## CASES

*Bier v. Good Chevrolet, Inc.*, 200 Wash. App. 1027 (2017)………………………………23

*Brooks v. Robert Larson Auto. Grp., Inc.*, No. C09-5016 FDB,
 2009 WL 2853452 (W.D. Wash. Sept. 1, 2009)…………………………………..23

*Burnett v. Pagliacci Pizza, Inc.*, 196 Wash. 2d 38, 470 P.3d 486 (2020)…………15,16,23

*Cox v. Kroger Co.*, 2 Wash. App. 2d 395, 409 P.3d 1191 (2018)…………………………21

*Dep't of Soc. & Health Servs. v. State Pers. Bd.*,
 61 Wash. App. 778, 812 P.2d 500 (1991)………………………………………………22

*Garrett v. Phillips Mills, Inc.*, 721 F.2d 979 (4th Cir. 1983)……………………………...12

*Gates v. TF Final Mile, LLC*, No. 1:16-CV-0341-RWS,
 2020 WL 2026987 (N.D. Ga. Apr. 27, 2020)………………………………………...17

*Godfrey v. Hartford Cas. Ins. Co.*, 142 Wash. 2d 885, 16 P.3d 617 (2001)………..........20,23

*Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 130 S. Ct. 2847,
 177 L. Ed. 2d 567 (2010)……………………………………………………………14,15

*Greyhound Corp. v. Div. 1384 of Amalgamated Ass'n of St. Elec. Ry.
 & Motor Coach Emps. of Am.*, 44 Wash. 2d 808, 271 P.2d 689 (1954)…...21,22,24

*Hamrick v. Partsfleet*, LLC, 1 F.4th 1337 (11th Cir. 2021)………………………….....19

*Harper v. Amazon.com Servs., Inc.*, 12 F.4th 287 (3d Cir. 2021)………………………..17

*Hollingbery v. Dunn*, 68 Wash. 2d 75, 411 P.2d 431 (1966)……………………………...12

*In re Grice*, 974 F.3d 950, 956 (9th Cir. 2020)………..………………………………….19

*Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 115 S. Ct. 1212,
 131 L. Ed. 2d 76 (1995)……………………………………………………………...23

*Mayne v. Monaco Enterprises, Inc.*, 191 Wash. App. 113, 361 P.3d 264 (2015)………....16

Case 1:22-cv-00055-CCE-JEP   Document 16   Filed 04/14/22   Page 3 of 31

# TABLE OF AUTHORITIES

## CASES (CONT'D)

*McFeeley v. Jackson St. Ent., LLC*, 825 F.3d 235, 241 (4th Cir. 2016)……………..…11,12

*Meier v. Stevens*, 17 Wash. App. 2d 1032 (2021)……………………………………………15

*Miller v. Amazon.com, Inc.*, No. 2:21-CV-00204-BJR, 2021 WL 5847232
    (W.D. Wash. Dec. 9, 2021)…………………………………………………..........17

*New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 202 L.Ed.2d 536 (2019)…………………19,20

*Palcko v. Airborne Express, Inc.,* 372 F.3d 588 (3d Cir. 2004)………………………17,24

*R & C Oilfield Servs., LLC v. Am. Wind Transp. Grp.*, LLC,
    447 F. Supp. 3d 339 (W.D. Pa. 2020)…………………………………………….20

*Rimov v. Schultz*, 162 Wash. App. 274, 253 P.3d 462 (2011)……………………………..20

*Rittmann v. Amazon.com, Inc.*, 971 F.3d 904 (9th Cir. 2020),
    *cert. denied*, 141 S. Ct. 1374, 209 L. Ed. 2d 121 (2021)………………1,16,17,18,19

*Romero v. Watkins & Shepard Trucking, Inc.*, 9 F.4th 1097 (9th Cir. 2021)……………...17

*Ross v. Subcontracting Concepts, LLC*, No. CV 20-12994,
    2021 WL 6072593 (E.D. Mich. Dec. 23, 2021)…………………………………...19

*Saleemi v. Doctor's Assocs., Inc.*, 176 Wash. 2d 368, 292 P.3d 108 (2013)………………14

*Smith v. CSRA*, 12 F.4th 396 (4th Cir. 2021)…………………………………………...12

*Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*,
    489 U.S. 468, 109 S. Ct. 1248, 103 L. Ed. 2d 488 (1989)…………………………23

*Waithaka v. Amazon.com, Inc.*, 966 F.3d 10 (1st Cir. 2020), *cert. denied*,
    141 S. Ct. 2794, 210 L. Ed. 2d 928 (2021), *reh'g denied*,
    141 S. Ct. 2886, 210 L. Ed. 2d 1001 (2021)…………………………………1,17,18

*Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798 (7th Cir. 2020)………………………..19

iv

## TABLE OF AUTHORITIES

## CASES (CONT'D)

*Walsh v. Med. Staffing of Am., LLC*, No. 2:18-CV-226,
    2022 WL 141528 (E.D. Va. Jan. 14, 2022)……………………………………..12

*Ward v. Express Messenger Sys., Inc.*, 413 F. Supp. 3d 1079 (D. Colo. 2019)……………17

## STATUTES & REGULATIONS

9 U.S.C. § 1……………………………………………………………..1,17,18,19,23

9 U.S.C. § 2……………………………………………………………...22,23

9 U.S.C. § 4……………………………………………………………...21,23

29 U.S.C. § 201 *et seq*………………………………………………………11

RCW Chapter 7.04A……………………………………………………...20

RCW § 7.04.010 (repealed)……………………………………………21,22,23,24

RCW § 7.04.030 (repealed)……………………………………………...21,22

RCW § 7.04A.030(4)……………………………………………….........1,21,22,23

RCW § 7.04A.070……………………………………………………………21

RCW § 41.56.122……………………………………………………………...22

RCW § 41.59.130……………………………………………………………...22

RCW § 49.66.090……………………………………………………………...22

Case 1:22-cv-00055-CCE-JEP   Document 16   Filed 04/14/22   Page 5 of 31

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**CASE NO. 1:22-cv-00055-CCE-JEP**

| | |
|---|---|
| AHAJI AMOS and<br>KIRK AMOS DELIVERY<br>AND COURIER, LLC,<br><br>                   Plaintiffs,<br><br>      vs.<br><br>AMAZON LOGISTICS, INC.,<br><br>                  Defendant. | **PLAINTIFFS' RESPONSE BRIEF TO DEFENDANT'S MOTION TO DISMISS AND COMPEL ARBITRATION PURSUANT TO RULE 12(B)(3)** |

## STATEMENT OF NATURE OF MATTER

This lawsuit is not subject to arbitration. Fundamentally, Plaintiffs did not assent to the arbitration clause presented by Defendant Amazon Logistics, Inc. ("ALI" or "Amazon") in support of its motion. But even if there were a valid arbitration agreement, it could not be enforced under the Federal Arbitration Act (FAA) because this is a lawsuit by a former transportation worker engaged in the movement of goods in interstate commerce. *See* 9 U.S.C. § 1; *Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 26 (1st Cir. 2020), *cert. denied*, 141 S. Ct. 2794, 210 L. Ed. 2d 928 (2021), *reh'g denied*, 141 S. Ct. 2886, 210 L. Ed. 2d 1001 (2021); *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 915–19 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1374, 209 L. Ed. 2d 121 (2021). Washington state law would also not enforce it because employer-employee arbitration agreements are expressly exempted from the Washington Uniform Arbitration Act (WUAA). *See* RCW § 7.04A.030(4). ALI's motion to dismiss or compel arbitration should therefore be denied.

1

## STATEMENT OF FACTS

E-commerce giant Amazon.com, Inc. and its subsidiaries comprise the world's largest retailer, with billions of products ordered online and delivered to American homes each year. (Comp., ¶ 10). ALI is Amazon's transportation and logistics subsidiary responsible nationwide for Amazon's last mile delivery operations. (Comp., ¶ 11-12).

ALI runs these operations through its Delivery Service Partner ("DSP") program. (*Id.*, ¶ 12-13). Ahaji Amos, a DSP from 2019 to 2021, has sued ALI for abusive conduct committed during their relationship. ALI has moved to dismiss or compel arbitration. (ECF No. 13).

Amos has submitted a Declaration affirming that the facts alleged in the Complaint and additional facts relevant to this brief are true and correct based on her personal knowledge. (ECF No. 16-1 – "Amos Declaration").

## The DSP Program as Employment

Plaintiffs allege that the DSP program constituted employment.

ALI marketed the DSP program only to individuals, and expressly rejected all applications from groups or companies. (Comp., ¶ 14-15). The DSP selection process was the same as being interviewed and screened for a traditional job. (Comp., ¶ 16). ALI considered only the applicant's own experience and qualifications. (*Id.*) The interview process was one-sided, with the candidate only learning specific details about the job after ALI made an offer. (Comp., ¶ 16). A candidate needed minimal financial resources and no prior logistics experience, as ALI would supply all training. (Comp., ¶ 14, 22, 48, 59-

60, 102). Though requiring candidates to pay a $10,000.00 DSP program entry fee, ALI did not treat the relationship as subject to state franchise laws. (Comp., ¶ 14, 26, 246-279).

Although the DSP program was open only to individual candidates, ALI required everyone accepted into it to create a new business entity and enter the DSP program only via the entity. (Comp., ¶ 13-23). ALI restricted the types of entities the DSP could choose and required the entity's name meet its approval. (Comp., ¶ 17-18). ALI walked-through prospective DSPs how to form the required entity step-by-step. (Comp., ¶ 17-18). ALI ensured that inexperienced persons could form the required entity with minimal effort: it offered them a do-it-yourself business entity formation package deal through LegalZoom. (Comp., ¶ 19). Before providing prospective DSPs the signing instructions for the DSP Program Agreement, ALI verified that they had formed the required entity. (Comp., ¶ 21-22). This ensured that DSPs would only execute the DSP Program Agreement through the required business entity rather than individually.[1] (Comp., ¶ 21-22).

Plaintiffs allege that ALI created the DSP program so that it could treat its DSPs and drivers as employees subject to its complete financial and operational control while improperly classifying them as independent contractors. (Comp., ¶ 13, 22, 123-126). Plaintiffs allege that ALI's purpose in requiring each DSP to use a business entity was to provide covering optics – to create a false appearance of independence and substance whenever courts scrutinized the arrangement. (*Id.*).

---

[1] As required by ALI, Amos formed Kirk Amos Delivery and Courier LLC, a single-member limited liability company with Amos as its sole member and manager, before executing the Program Agreement. (Comp., ¶ 25).

3

At the same time, ALI instituted various ownership and other restrictions on its DSPs. (Comp., ¶ 23). DSPs could not consolidate, expand, or have common ownership or financing, for example. (Comp., ¶ 22-23). ALI did this so its DSPs would remain fragmented and wholly dependent on it. (Comp., ¶ 13, 21-22, 123-126).

ALI instituted the above structuring intending DSPs to serve as a legal firewall between it and its drivers and operations. (*Id.*). If the structuring succeeded, ALI would then get the benefits of a directly-controlled workforce and van fleet but without the attendant employer-employee and operational liabilities. (Comp., ¶ 13). In turn, DSPs would bear all costs and risks but without any offsetting hope of succeeding in a genuine business venture. (*Id.*).

As a DSP, ALI tasked Amos to hire drivers and lease Amazon-branded vans to deliver Amazon packages from ALI's DRT1 station in Durham, North Carolina. (Comp., ¶ 28-29, 81). Amos did not deliver packages for anyone other than ALI, and she was economically tied exclusively to ALI for all DSP business operations. (Comp., ¶ 45, 94). Amos worked for ALI as a DSP continually from mid-2019 to April 2021, when ALI terminated the relationship. (Comp., ¶ 29).

ALI exerted total oversight and control over Amos and her drivers.

ALI unilaterally set the Program Policies that governed all material terms of Amos' and her drivers' work. (Comp., ¶ 31-43, 46, 55-63, 75, 167). These policies set forth the detailed requirements, parameters, and guidance for their daily operations. (*Id.*). ALI mandated that Amos follow them day-to-day and closely monitored her compliance. (*Id.*). The Program Policies also set the financial metrics and rules that determined payments and

4

reimbursements to DSPs. (*Id.*). ALI frequently changed the Program Policies at-will to benefit itself and applied the changes retroactively. (*Id.*). ALI used its control over the Program Policies to make it impossible for Amos and other DSPs to meet its oft-changing requirements without losing money. (Comp., ¶ 32-44, 55-63).

ALI controlled Amos' hiring of drivers. (Comp. ¶ 72-74). ALI had to pre-approve all hires, and it routinely overrode and rejected employment offers made by Amos. (Comp., ¶ 72). Amos was not free to make her own hiring decisions and was subject to termination if she tried. (*Id.*). ALI required Amos to run background checks on prospective hires using companies it selected. (Comp., ¶ 73). ALI would then review the results before accepting or rejecting each candidate. (Comp., ¶ 73). ALI also determined the content of Amos' employment applications, offers of employment, and employee handbook. (Comp., ¶ 74).

ALI controlled Amos' management of her drivers. (Comp., ¶ 75-80). ALI determined the number of drivers Amos employed at any given time, requiring her to hire or layoff drivers at its sole discretion. (Comp., ¶ 79). ALI directly supervised and evaluated her drivers' performance, and decided whether to discipline, retrain, or terminate them. (Comp., ¶ 75). ALI often disciplined Amos' drivers arbitrarily. (Comp., ¶ 152). ALI did not allow Amos to appeal or challenge its disciplinary decisions involving her drivers. (Comp., ¶ 76-77). ALI inspected her drivers each day, and pulled her drivers off routes for minor matters such as not wearing a complete uniform, wearing an unbranded hat, or having a small rust stain on the delivery van. (Comp., ¶ 47, 78). ALI directed her drivers' training. (Comp., ¶ 48, 76).

5

ALI controlled Amos' compensation of her drivers. ALI set their payrates and used Amos as a pass-through for direct payments to them. (Comp., ¶ 94-95, 104). ALI paid for her drivers' fuel charges directly by issuing them Amazon debit gas cards to purchase gasoline. (Comp., ¶ 93). ALI required Amos to use a selected payroll services provider and had full access to Amos' payroll and private employee records. (Comp., ¶ 91-92). ALI routinely accessed and made changes to Amos' payroll without her permission and without notice. (*Id.*). In contrast, the payroll provider refused to make changes to Amos' payroll without ALI's prior approval. (*Id.*). ALI required Amos to provide her drivers health insurance and threatened breach of contract when she provided them health insurance not purchased through Amazon. (Comp., ¶ 117, 191).

ALI micromanaged Amos' drivers' minute-by-minute activities. ALI did so through direct contact, telemetrics, a proprietary smartphone app called "Amazon Flex," and real-time monitoring. (Comp., ¶ 49, 51, 54, 101). ALI electronically tracked all time worked by Amos and her co-employees to the second. (Comp., ¶ 108). ALI used proprietary systems to track and monitor each driver's job performance in real time, including delivery rate, delivery speed, delivery accuracy, driver distractions, seatbelt use, driving speed and acceleration, and adherence to ALI's delivery schedule. (Comp., ¶ 54). ALI sent an email documenting each delivery driver's job performance to Amos every day. (*Id.*). ALI unilaterally evaluated and ranked drivers based on the monitored performance and set Amos' pay based on it. (Comp., ¶ 55-65).

ALI made direct contact with Amos' drivers despite her requests not to do so, often directing them to re-attempt redelivery, to continue or stop delivering, or to help other

6

DSPs' drivers deliver Amazon packages. (Comp., ¶ 71, 113-114). ALI often contacted Amos' drivers directly to tell them to skip meal breaks or work overtime. (Comp., ¶ 114, 118-120). If a driver stopped for more than five minutes, the tracking system would send an alert. (Comp., ¶ 71). A DRT1 ALI employee would then contact Amos and the driver and would directly order the driver to keep moving. (*Id.*). ALI sometimes recalled Amos' drivers mid-shift. (Comp., ¶ 70). ALI routinely threatened Amos' drivers with suspension or termination if they did not go back out to attempt redelivery of all dispatched packages, even if the driver had already worked longer than his shift. (Comp., ¶ 68).

ALI controlled Amos' management of her van fleet. ALI required Amos to lease vans branded with Amazon trademarks exclusively from a company it selected and controlled. (Comp., ¶ 81-90, 192, 194). ALI solely determined the number, timing, and types of vans provided to Amos. (*Id.*). As a result, Amos sometimes received surprise van deliveries. (Comp., ¶ 81). ALI had to approve any increases or decreases to Amos' delivery van fleet and did not give Amos the freedom to decide for herself. (*Id.*). ALI also set and monitored maintenance standards for Amos' vans in real-time and determined if Amos could deliver using them. (Comp., ¶ 101). Amos could not set her own vehicle repair timelines. (Comp., ¶ 41).

ALI controlled Amos' delivery routes. Every week, ALI sent Amos the number, type, and start time for the delivery routes. (Comp., ¶ 52). ALI set the routes without considering difficulty factors like business closures and traffic. (Comp., ¶ 66-67). ALI did not allow Amos to alter the routes. (Comp., ¶ 66). Amazon informed Amos' drivers

directly of their assigned route and monitored compliance using proprietary "Amazon Flex" software.  (Comp., ¶ 52-54).

ALI controlled Amos' business operations and arrangements.  Amos could not share drivers with other DSPs.  (Comp., ¶ 80).  Amos could not choose her own vendors or service providers.  (Comp., ¶ 91).  Amos could not enter common ownership or financing arrangements with other DSPs or with third parties having an interest in another DSP. (Comp., ¶ 23).  Amos could not marry another DSP.  (Comp., ¶ 23).  Amos could not convert her business to a general, limited, or limited liability partnership.  (Comp., ¶ 17). Amos was subject to intrusive financial monitoring by ALI.  (Comp., ¶ 149-150).  ALI did not expect or allow Amos or other DSPs to rely on their own business acumen, experience, or decision-making.  (Comp., ¶ 14, 59, 102-103).

ALI demanded that Amos devote every moment of her life to it.  Amos was on call at all hours of the day and night, 365 days per year, and often received over 100 communications and directions from Amazon daily.   (Comp., ¶ 110).  Amos personally worked more than sixty hours per week for ALI, similar to the hours worked for ALI by other DSPs.  (Comp., 110-111).  Amazon continually called Amos on her cell phone, on average about every 15 minutes between 5:45 am until about 10:30 pm.  (Comp., ¶ 137). ALI did not even give Amos a reprieve from its constant calls and messages while she had emergency surgery for a miscarriage.  (Comp., ¶ 136).

### The Last Mile Delivery Process

The last mile delivery process worked as follows.  DRT1 was Amazon's delivery station for the Durham area.  (Comp., ¶ 29).  Multiple DSPs worked out of DRT1, including

8

Amos. (Comp., ¶ 126, 152). ALI oversaw DRT1 operations and managed the DSPs and their drivers. (Comp., ¶ 71, 100, 103, 119, 126, 133, 146, 149, 159, 160). Amazon standardized and centrally controlled and directed the delivery process there and at its other delivery stations. (Comp., ¶ 50).

Durham-based Amazon.com Prime customers shopped on Amazon.com's online portal and ordered goods from Amazon for home delivery. (Comp., ¶ 11). The DRT1 station received the ordered goods as packages and ALI employees pre-sorted them there to prepare them for delivery. (Comp., ¶ 53). Amazon determined all aspects of the delivery routes and assigned them to the DRT1 DSPs' drivers using Amazon Flex. (Comp., ¶ 52-53). Amos' drivers logged into Amazon Flex to access their assigned route and picked up the assigned packages from DRT1. (Comp., ¶ 53). They then delivered the packages, in Amazon uniforms and in Amazon-branded vans, to homes in the same condition as they were received at the Amazon DRT1 delivery station. (Comp., ¶ 47, 53). These packages were not transformed or modified during the shipping process. (Comp., ¶ 53).

ALI provided operational training to Amos over a three-week period and required that she be trained as an Amazon delivery driver. (Amos Declaration, ¶ 7). In addition to hiring, supervising, and scheduling drivers and maintaining Amazon-branded delivery vehicles as a DSP, Amos personally drove ALI routes as a delivery driver and delivered Amazon packages herself. (*Id.*; Comp., ¶ 110).

### ALI Proffers a Different, Unexecuted Program Agreement

Plaintiffs executed the Program Agreement on May 7, 2019 via a DSP onboarding portal. (Comp., ¶ 27; ECF No. 15, p.2, ¶ 5; Amos Declaration, ¶ 5). ALI restricted Amos

from downloading the May 7, 2019 Program Agreement from its portal and made it impossible to review or execute it outside the portal. (Amos Declaration, ¶ 5). Consequently, she does not have a copy. (*Id.*).

ALI has presented a different document in support of its motion, an unsigned copy of a Program Agreement dated February 6, 2020, which Plaintiffs did not execute. (ECF No. 15, p. 4-11; Amos Declaration 6). ALI does not contend Plaintiffs executed it. (*See* ECF No. 15, p. 1-2, ¶ 3, 5).

The February 2020 Program Agreement contains undisclosed "revisions" compared to the May 2019 version Plaintiffs executed. (ECF No. 15, p.2, ¶ 5).

The February 2020 Program Agreement claims it becomes effective simply upon being read, e.g. "click[ed] through." (ECF No. 15, p. 5).

The February 2020 Program Agreement states that ALI may modify it at any time by posting a revised version in an online portal. (ECF No. 15, p. 10, ¶ 14). It further states that the DSP is responsible for discovering any such modifications and that the DSP's continued performance after modification binds the DSP to the new agreement. (*Id.*). The February 2020 Program Agreement also states that if the DSP does not agree to the modifications, it must stop performing services. (*Id.*).

The February 2020 Program Agreement "is governed by the United States Federal Arbitration Act, applicable United States federal law, and Washington state law, without reference to any applicable conflict of laws rules." (ECF No. 15, p. 9, ¶ 13).

The February 2020 Program Agreement contains an arbitration clause. (*Id.*).

ALI does not show the Court what the May 2019 Program Agreement said or contained with respect to any of the above terms.

## ARGUMENT

### Amos was ALI's Employee

As an initial matter relevant to what follows, Amos was ALI's employee.

In a Fair Labor Standards Act (FLSA) context, 29 U.S.C. § 201 *et seq*., courts distinguish between an employer-employee versus an independent contractor relationship based on the underlying economic realities, not titles: "whether the worker is economically dependent on the business to which he renders service or is, as a matter of economic reality, in business for himself." *McFeeley v. Jackson St. Ent., LLC*, 825 F.3d 235, 241 (4th Cir. 2016)(quoting *Schultz v. Cap. Int'l Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006)(internal citations omitted and cleaned up). The economic realities test examines six factors:

(1) The degree of control that the putative employer has over the manner in which the work is performed;

(2) the worker's opportunities for profit or loss dependent on his managerial skill;

(3) the worker's investment in equipment or material, or his employment of other workers;

(4) the degree of skill required for the work;

(5) the permanence of the working relationship; and

(6) the degree to which the services rendered are an integral part of the putative employer's business.

*Id.*

11

More broadly, state common law and other federal claims emphasize right of control as the most important distinguishing factor. *See Garrett v. Phillips Mills, Inc.*, 721 F.2d 979, 982 (4th Cir. 1983); *Smith v. CSRA*, 12 F.4th 396, 413 (4th Cir. 2021); *Hollingbery v. Dunn*, 68 Wash. 2d 75, 79–81, 411 P.2d 431, 435–36 (1966). Courts examining the issue in an FLSA context also recognize control as a key factor. *See Walsh v. Med. Staffing of Am., LLC*, No. 2:18-CV-226, 2022 WL 141528, at *9 (E.D. Va. Jan. 14, 2022); *McFeeley*, 825 F.3d at 241-243.

Here, the factors strongly indicate employment.

First, ALI exerted complete oversight and control over Plaintiffs. ALI made all business, operational, and financial decisions and deprived Amos of autonomy over basic matters. Amos could not, for example, independently determine the size of her workforce, their compensation and benefits, or whether to hire, fire, train, or discipline her drivers. She could not determine the size or composition of her van fleet. She could not choose her own leasing or van procurement arrangements. She could not freely choose her vendors. She could not determine schedules, routes, or other operational details. She could not set or enforce her own vehicle maintenance standards or repair schedules, her own employment policies, or even her own employee dress code.

ALI monitored and controlled Amos' drivers in real-time and consistently overrode her ostensible authority by directly supervising and disciplining drivers that reported to her. Her drivers could not even take a five-minute break without ALI's direct intervention. Tellingly, ALI directed Amos' drivers to perform acts that were beneficial to it but not

12

Amos, such as working overtime uncompensated by ALI and assisting other DSPs in delivering packages.

ALI demanded all of Amos' time and attention. Amos worked 60-hour weeks for ALI and was always on call. ALI's demands were extreme: it contacted Amos constantly and gave her no respite even for a miscarriage requiring surgery.

In short, ALI exercised a near-absolute degree of control over Amos.

The second factor, Amos' opportunities for profit or loss dependent on her managerial skill, also supports employee status. ALI expected her to have no prior logistics experience and supervised and managed her directly. ALI also deprived Amos of managerial discretion and used its control over the DSP program to eliminate profit-making opportunity. Amos' managerial skills mattered little because ALI constrained her from exercising them.

The third factor, Amos' investment in equipment or material, or her employment of other workers, also supports employee status. ALI required her and other DSPs to have minimal financial resources and did not allow them to freely make their own investment or employment decisions. ALI determined the size and composition of Amos' workforce, who she employed, what she paid them, and whether she kept them, fired them, or laid them off. ALI determined all aspects of how, when, and where she got her vans, the financing arrangements, how many vans she had, their maintenance and repairs, and everything else. ALI supplied the delivery station, its workers, its managers, and the packages.

The fourth factor, the degree of skill required for the work, favors employment. ALI made the DSP program accessible to those willing to do the work. It spoon-fed the business entity creation step so that anyone could do it and provided ongoing training, management, and monitoring of its DSPs. It treated Amos and other DSPs as mid-level workers and expected them to perform human resources, maintenance, and even delivery driver tasks. None of what ALI allowed Amos to do required or took advantage of her high-level entrepreneurial skill set.

The fifth factor, the permanence of the working relationship, supports employment. Amos worked for ALI exclusively and continually for nearly two years as a DSP.

Finally, the sixth factor, the degree to which the services rendered are an integral part of ALI's business, favors employee status. Amazon's entire business model depends on Amos and the other DSPs to provide the last mile delivery services from its delivery stations so that its consumers will quickly get the products they ordered. If the DSPs ceased work, Amazon would instantly be paralyzed because they do not otherwise employ delivery drivers. Tellingly, after cancelling two DSPs' contracts at DRT1, ALI divided up their drivers among the remaining DSPs – something it could not have done if the DSPs were not integrated into ALI's business.

In conclusion, Amos was ALI's employee, not an independent contractor.

### Amos did not Assent to the Arbitration Clause

Under both the FAA and Washington law, the Court determines whether an arbitration clause is valid and enforceable. *Saleemi v. Doctor's Assocs., Inc.*, 176 Wash. 2d 368, 376, 292 P.3d 108, 112 (2013); *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561

U.S. 287, 296–97, 130 S. Ct. 2847, 2855–56, 177 L. Ed. 2d 567 (2010). General state contract law principles drive the determination. *Id.*

Assuming *arguendo* that Washington substantive law applies,[2] the February 2020 Program Agreement is not a valid and enforceable contract. As such, ALI cannot enforce the arbitration clause contained in it.

The formation of a valid contract requires mutual assent. *See Burnett v. Pagliacci Pizza, Inc.*, 196 Wash. 2d 38, 48, 470 P.3d 486, 491 (2020). In an employment context, an employee provided with a document containing an arbitration clause is not bound simply by receiving it. *Id.* at 51-53; *Meier v. Stevens*, 17 Wash. App. 2d 1032 (2021). Nor is the employee bound by continuing to perform work for the employer, as ALI asserts. *Burnett*, 196 Wash. 2d at 51-53.

Similarly, an agreement that allows one party to unilaterally modify the arbitration agreement is unenforceable as illusory. *See id.* at 53 n.4 (collecting cases but not reaching issue); *Meier*, 17 Wash. App. 2d 1032 at *3.

Here, ALI has presented a February 2020 Program Agreement, a different document than the May 2019 Program Agreement Amos executed. The February 2020 Program Agreement claims a unilateral right for ALI to modify it at any time and claims that DSPs are responsible for discovering these modifications. The February 2020 Program Agreement also claims that DSPs are bound by it by continuing to perform work.

---

[2] ALI contends, based on the choice of law clause in the February 2020 Program Agreement, that Washington substantive law applies. Plaintiffs dispute that the February 2020 Program Agreement controls.

The February 2020 Program Agreement is not enforceable under *Burnett*. Nor is it enforceable because it is illusory.

While the February 2020 Program Agreement is unenforceable for the above reasons, it also fails for unconscionability. There are two types of unconscionability: procedural and substantive. *See Burnett*, 196 Wash. 2d at 54. Only one need be shown to invalidate an agreement. *Id.*

An agreement is procedurally unconscionable when a party with unequal bargaining power lacks a meaningful choice. *Id.* at 54. A choice compelled by the threat of immediate termination from employment is not a meaningful choice. *Mayne v. Monaco Enterprises, Inc.*, 191 Wash. App. 113, 123, 361 P.3d 264, 269 (2015).

Here, Amos had no bargaining power. Nor was there meaningful choice: ALI unilaterally modified the Program Agreement as it desired, and claimed the modifications were automatically effective and binding on its DSPs. The changes may have been material, such as would be the case if ALI fixed the drafting flaw that resulted in an arbitration clause failing. *See Rittmann*, 971 F.3d at 920. ALI also put the onus on its counterparties to discover that it was modifying the agreement and to find it in a portal. Even had she been aware of the changes and disapproved of them, Amos faced immediate loss of her livelihood if she did not accept them. In consequence, the February 2020 Program Agreement, and the arbitration clause it contains, fails as procedurally unconscionable.

In sum, the arbitration clause presented by ALI is not valid and enforceable as a matter of contract law.

Even if it were a valid contract, though, it would not be enforceable under either the FAA or Washington substantive law.

## This Arbitration Clause is not Enforceable Under the FAA

The FAA does not apply to "contracts of employment of seamen, railroad employees, <u>or any other class of workers engaged in foreign or interstate commerce</u>." 9 U.S.C. § 1 (emphasis added). The courts that have interpreted this provision in lawsuits brought by Amazon's last mile delivery providers have consistently held that they are transportation workers engaged in interstate commerce and therefore exempt from the FAA.[3] *See Rittmann*, 971 F.3d 904 at 919; *Waithaka*, 966 F.3d at 26; *Miller v. Amazon.com, Inc.*, No. 2:21-CV-00204-BJR, 2021 WL 5847232, at *5 (W.D. Wash. Dec. 9, 2021). Though these delivery providers do not typically cross state lines to make deliveries but rather stay in-state, their integral role in delivering goods still in flow from out-of-state makes them "engaged in interstate commerce" for § 1 purposes. *Id.* Many courts examining in-state delivery services performed for companies other than Amazon engaged in transporting and delivering goods interstate have found similarly. *See Ward v. Express Messenger Sys., Inc.*, 413 F. Supp. 3d 1079, 1086–87 (D. Colo. 2019); *Gates v. TF Final Mile, LLC*, No. 1:16-CV-0341-RWS, 2020 WL 2026987, at *4–5 (N.D. Ga. Apr. 27, 2020); *Palcko v. Airborne Express, Inc.,* 372 F.3d 588, 590, 593 (3d Cir. 2004); *Romero v. Watkins & Shepard Trucking, Inc.*, 9 F.4th 1097, 1100 (9th Cir. 2021).

---

[3] One court did not reach the issue. *See Harper v. Amazon.com Servs., Inc.*, 12 F.4th 287, 296–97 (3d Cir. 2021).

Case 1:22-cv-00055-CCE-JEP   Document 16   Filed 04/14/22   Page 22 of 31

Amazon's last mile delivery drivers are engaged in interstate commerce because they "haul goods on the final legs of interstate journeys" as a seamless, integral part of Amazon's interstate transportation operations. *See Rittmann*, 971 F.3d at 915; *Waithaka*, 966 F.3d at 26. These operations start when its customers order goods online for home delivery. These goods are shipped nationwide in packages to Amazon delivery stations like DRT1, where Amazon directs their final delivery using DSPs like Amos. As noted by the 9th Circuit:

> The packages are not held at warehouses for later sales to local retailers; they are simply part of a process by which a delivery provider transfers the packages to a different vehicle for the last mile of the packages' interstate journeys. The interstate transactions between Amazon and the customer do not conclude until the packages reach their intended destinations[.]

*Rittmann*, 971 F.3d at 916. Because Amazon's last mile delivery drivers "complete the delivery of goods that Amazon ships across state lines. . . [they] form a part of the channels of interstate commerce[.]" *Id.* at 917.

In arguing that § 1 does not apply here, ALI ignores *Rittmann* and *Waithaka*. Instead, it cites inapplicable cases like those involving rideshare and takeout food delivery drivers. (ECF No. 14, p. 16-17).

The 9th Circuit explained why Amazon last mile delivery drivers are covered by the § 1 exemption but rideshare and food delivery drivers are not:

> In each case, the critical factor was not the nature of the item transported in interstate commerce (person or good) or whether the plaintiffs themselves crossed state lines, but rather "[t]he nature of the business for which a class of workers perform[ed] their activities."

*In re Grice*, 974 F.3d 950, 956 (9th Cir. 2020)(quoting *Waithaka*, 966 F.3d at 10). The key determinant is "the worker's active engagement in the enterprise of moving goods across interstate lines," *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 802 (7th Cir. 2020), a showing met by Amazon's in-state delivery drivers but not by rideshare drivers or drivers making intrastate deliveries for local merchants not engaged in interstate goods transport businesses. *See Rittmann*, 971 F.3d at 916-17; *Grice*, 974 F.3d at 956; *see also Ross v. Subcontracting Concepts, LLC*, No. CV 20-12994, 2021 WL 6072593, at *8 (E.D. Mich. Dec. 23, 2021)(distinguishing businesses like Amazon from those "where items have already made their interstate journey and then are purchased by consumers from a local retailer"); *Hamrick v. Partsfleet*, LLC, 1 F.4th 1337, 1350–51 (11th Cir. 2021)(rejecting argument that delivering goods that had traveled interstate was sufficient for § 1 exemption). Critically, Amazon's business centers on the delivery of goods ordered and shipped interstate directly to consumers' homes, and its DSPs and their drivers perform their work as integral to that process.

Here, Amos personally drove routes as an Amazon delivery driver and delivered Amazon packages. The Court should adopt the reasoning of the other cases that have considered this issue and find the § 1 exemption applicable to Amos as a transportation worker engaged in interstate commerce.

## This Case Involves a "Contract of Employment"

The U.S. Supreme Court has held that employer-employee versus independent contractor status does not determine whether a transportation worker has a "contract of employment" for § 1 purposes. *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539–41, 202

L.Ed.2d 536 (2019). However, while *New Prime* did not find an employer-employee relationship <u>necessary</u> for a "contract of employment," it is clearly sufficient. *See id.*

A worker's claims invoking the FLSA for non-payment of wages necessarily entail a "contract of employment." *See R & C Oilfield Servs., LLC v. Am. Wind Transp. Grp.*, LLC, 447 F. Supp. 3d 339, 347 (W.D. Pa. 2020). ALI mischaracterizes Amos' allegations in this regard. (ECF No. 14, p. 15-16). Amos alleges she was ALI's employee and that ALI owes her unpaid wages under the FLSA. Amos also alleges that ALI required her to create a business entity so that ALI could use it to improperly misclassify her as an independent contractor.

In contrast, *R & C Oilfield* was a purely commercial dispute having no connection to employment or employment-related claims. *See id.* at 344. It has no bearing on the situation here.

<u>**This Lawsuit is not Subject to Arbitration under**</u>
<u>**Washington's Uniform Arbitration Act**</u>

As discussed above, the FAA does not apply. The following analysis assumes *arguendo* that Washington substantive law should then be considered.

Arbitration in Washington is statutory and controlled by the Washington Uniform Arbitration Act (WUAA). *See Rimov v. Schultz*, 162 Wash. App. 274, 279, 253 P.3d 462, 465 (2011); Chapter 7.04A, Revised Code of Washington. Washington does not recognize or permit common law arbitration. *Godfrey v. Hartford Cas. Ins. Co.*, 142 Wash. 2d 885, 893, 16 P.3d 617, 621 (2001). Rather, all rights to arbitration are governed and controlled by statute. *Id.*

20

RCW § 7.04A.030(4) exempts employer-employee arbitration agreements from the WUAA. It states expressly: "[t]his chapter does not apply to any arbitration agreement between employers and employees or between employers and associations of employees." *See Cox v. Kroger Co.*, 2 Wash. App. 2d 395, 403 n.14, 409 P.3d 1191, 1196 n.14 (2018).

RCW § 7.04A.070 is the WUAA's enforcement statute. That statute empowers a court to order the parties to arbitrate and stay the case if it finds an enforceable agreement to arbitrate. It is the analogue to the FAA's 9 U.S.C. § 4.

This case involves an employer-employee arbitration agreement. As such, the WUAA, and particularly its enforcement mechanisms in RCW § 7.04A.070, does not apply. Therefore, the Court may not stay the case and order arbitration under Washington substantive law. *See Greyhound Corp. v. Div. 1384 of Amalgamated Ass'n of St. Elec. Ry. & Motor Coach Emps. of Am.*, 44 Wash. 2d 808, 814–15, 271 P.2d 689, 693 (1954).

*Greyhound* illustrates this outcome. The case involved an arbitration agreement between an employer and an association of employees and interpreted earlier versions of current RCW § 7.04A.030(4) and RCW § 7.04A.070, the now-repealed RCW § 7.04.010 and RCW § 7.04.030.

RCW § 7.04.030, like RCW § 7.04A.070, empowered a court to stay the case and order arbitration upon motion by a party to an arbitration agreement. RCW § 7.04.010 had important extra language compared to current RCW § 7.04A.030(4):

> The provisions of this chapter shall not apply to any arbitration agreement between employers and employees or between employers and associations of employees, <u>and as to any such agreement the parties thereto may provide for any method and procedure for the settlement of existing or future disputes and controversies, and such procedure shall be valid, enforceable and</u>

> irrevocable save upon such grounds as exist in law or equity for the
> revocation of any agreement.

(Emphasis added).  This highlighted language, echoing 9 U.S.C. § 2, was repealed in 2006 when RCW § 7.04A.030(4) was enacted in its place.

Under RCW § 7.04.010, the parties in *Greyhound* could have provided that the statutory enforcement mechanisms of RCW § 7.04.030 applied.  *See* 44 Wash. 2d at 812-15.  They could have done so by expressly writing those terms into the agreement.  *See id*. They did not, however.  *Id.*  Nor did they specify any other enforcement mechanism for their arbitration agreement, under the now-repealed language that made such alternate procedures enforceable by a court.  *See id.*  The result was that the court lacked the power to stay the case and order arbitration.  *Id.* at 814-815.  Instead, the case proceeded in court. *Id.*; *see also Dep't of Soc. & Health Servs. v. State Pers. Bd.*, 61 Wash. App. 778, 784 n.4, 812 P.2d 500, 504 n.4 (1991)(noting that *Greyhound* held that the statutory procedure for obtaining a stay of arbitration was not available because the arbitration clause "neither contained such a procedure nor made the statutory procedure expressly applicable").

The situation is starker here.  RCW § 7.04A.030(4) omits the previous language that employer-employee arbitration clauses may provide enforcement mechanisms that the courts will administer.  Instead, it excludes employer-employee arbitration agreements from the WUAA entirely.  Therefore, Washington substantive law provides no enforcement mechanism for employer-employee arbitration clauses.[4]

---

[4] Other than in irrelevant contexts, like public employee, educational employee, or healthcare employee collective bargaining agreements.  *See* RCW § 41.56.122; RCW § 41.59.130, RCW § 49.66.090.

That said, most employer-employee arbitration agreements are covered by the FAA. *See* 9 U.S.C. § 2. Such arbitration agreements may expressly select the WUAA or former RCW § 7.04.010 as the governing law.[5] *See Bier v. Good Chevrolet, Inc.*, 200 Wash. App. 1027 (2017); *Brooks v. Robert Larson Auto. Grp., Inc.*, No. C09-5016 FDB, 2009 WL 2853452, at \*2 (W.D. Wash. Sept. 1, 2009); *Burnett v. Pagliacci Pizza, Inc.*, 196 Wash. 2d 38, 47 n.1, 470 P.3d 486, 491 n.1 (2020). In such cases where an arbitration agreement subject to the FAA chooses to be governed under state arbitration law, the FAA remains waiting in the wings to enforce it if state law falters. *See Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 477–79, 109 S. Ct. 1248, 1255–56, 103 L. Ed. 2d 488 (1989); *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62–64, 115 S. Ct. 1212, 1218–19, 131 L. Ed. 2d 76 (1995); 9 U.S.C. § 4.

Implicit though unsaid in these cases is that the FAA has latent power to enforce an employee-employer arbitration agreement that has chosen the WUAA procedures. *See* 9 U.S.C. § 4. For this reason, they do not support that a court applying Washington substantive law under RCW § 7.04A.030(4) would enforce an employer-employee arbitration agreement whenever 9 U.S.C. § 1 <u>excludes</u> the FAA, even if the agreement expressly selects the WUAA. In such situations where the FAA cannot act, the parties cannot contractually expand the WUAA to cover their statutorily-excluded arbitration agreement. *See Godfrey*, 142 Wash. 2d at 893. Indeed, common law arbitration does not

---

[5] The arbitration clause presented by ALI does <u>not</u> expressly select the WUAA or its statutory framework as governing law.

exist, *see id.*, while the old common law rule was that an arbitration agreement cannot divest the court of jurisdiction. *See Greyhound*, 44 Wash. 2d at 811.

Finally, *Palcko v. Airborne Express* does not support that the arbitration clause here is enforceable under current Washington substantive law. (*See* ECF No. 14, p. 18, citing *Palcko,* 372 F.3d at 596). Critically, *Palcko* was decided in 2004, when RCW § 7.04.010 permitted enforcement of employee-employer arbitration agreements if the agreement specified the enforcement procedures. In addition, the court only considered whether FAA exemption suppressed Washington state law via preemption, not whether Washington substantive law would enforce the arbitration agreement otherwise. *See Palcko*, 372 F.3d at 595–96. Instead, it remanded the case to the district court to decide that issue. *See id.*

## CONCLUSION

For the above reasons, ALI's motion to dismiss or compel arbitration should be denied.

This is the 14th day of April, 2022.

*/s/ Danielle Barbour Wilson*
Danielle Barbour Wilson
NC State Bar No. 39516
dwilson@bankslawfirm.com
Jesse H. Rigsby, IV
NC State Bar No. 35538
jrigsby@bankslawfirm.com
The Banks Law Firm, P.A.
P.O. Box 14350
Research Triangle Park, NC 27709
Phone: (919) 474-9137
Fax: (919) 474-9537

*Attorneys for Plaintiffs*

24

## WORD COUNT CERTIFICATION

Pursuant to Local Rule 7.3(d), undersigned counsel hereby certifies that the foregoing brief contains 6,249 words and complies with Local Rule 7.3(d) and its word count limit of 6,250 words. As provided in LR 7.3(d), the word count calculated using MS Word's automatic word count function and includes the body of the brief, headings and footnotes, but does not include the caption, signature lines, certificate of service, word count certification, and any cover page or index.

This is the 14th day of April, 2022.

*/s/ Danielle Barbour Wilson*
Danielle Barbour Wilson
NC State Bar No. 39516
dwilson@bankslawfirm.com
Jesse H. Rigsby, IV
NC State Bar No. 35538
jrigsby@bankslawfirm.com
The Banks Law Firm, P.A.
P.O. Box 14350
Research Triangle Park, NC 27709
Phone: (919) 474-9137
Fax: (919) 474-9537

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has this day filed a true and accurate copy of the foregoing document with the Court using the CM/ECF system, and thereby certify that this document has been electronically served to the following person(s):

Philip S. McCune
Diana S. Breaux
Summit Law Group, PLLC
315 Fifth Avenue S., Suite 1000
Seattle, WA 98104-2682
Email: philm@summitlaw.com
Email: dianab@summitlaw.com

Christopher T. Graebe
Morningstar Law Group
421 Fayetteville Street, Suite 530
Raleigh, NC 27601
Email: cgraebe@mstarlaw.com

*Attorneys for Defendant*

This is the 14th day of April, 2022.

*/s/ Danielle Barbour Wilson*
Danielle Barbour Wilson
NC State Bar No. 39516
dwilson@bankslawfirm.com
Jesse H. Rigsby, IV
NC State Bar No. 35538
jrigsby@bankslawfirm.com
The Banks Law Firm, P.A.
P.O. Box 14350
Research Triangle Park, NC 27709
Phone: (919) 474-9137
Fax: (919) 474-9537

*Attorneys for Plaintiffs*